# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### October 3, 2000 Session at Nashville

# STATE OF TENNESSEE v. TONY V. CARRUTHERS & JAMES MONTGOMERY

**Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 94-02797-99 and 95-1128-29,  Joseph B. Dailey, Judge**

---

**No. W1997-00097-SC-DDT-DD - Filed December 11, 2000**

---

Tony Carruthers and James Montgomery were each convicted of three counts of first degree premeditated murder and were sentenced to death on each conviction.  The Court of Criminal Appeals affirmed the convictions and sentences of both Carruthers and Montgomery.  Thereafter, the cases were docketed in this Court. After carefully reviewing the record and the relevant legal authorities, we conclude that none of the errors raised by Tony Carruthers require reversal, that the evidence is sufficient to support the jury's findings of the aggravating circumstances, and that the sentences of death are not excessive or disproportionate considering the circumstances of the crimes and the defendant.  With respect to James Montgomery, we conclude that the trial court erred in denying him a severance and that the error resulted in Montgomery being deprived of a fair trial. Accordingly, we reverse Montgomery's convictions and sentences and remand for a new trial.

 **Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal; Judgment of the Court of Criminal Appeals Affirmed with respect to Tony V. Carruthers; Judgment of the Court of Criminal Appeals Reversed with respect to James Montgomery and Case Remanded for a New Trial**

FRANK F. DROWOTA, III, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.  ADOLPHO A. BIRCH, JR., J., filed a concurring/dissenting opinion.

Stephen R. Leffler and Lee A. Filderman, Memphis, Tennessee, for the appellant, Tony V. Carruthers.

Robert C. Brooks and Edward W. Chandler, Memphis, Tennessee, for the appellant, James Montgomery.

Michael E. Moore, Solicitor General; Amy Tarkington, Senior Counsel;  Phillip Gerald Harris; Assistant District Attorney General; and J. Robert Carter, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendants, Tony V. Carruthers and James Montgomery, were each convicted of first degree murder for killing Marcellos "Cello" Anderson, his mother Delois Anderson, and Frederick Tucker in Memphis in February of 1994.[1] All of the victims disappeared on the night of February 24, 1994. On March 3, 1994, their bodies were found buried together in a pit that had been dug beneath a casket in a grave in a Memphis cemetery.[2]

**The Guilt Phase**

The proof introduced at the guilt phase of the trial showed that one of the victims, Marcellos Anderson, was heavily involved in the drug trade, along with two other men, Andre "Baby Brother" Johnson and Terrell Adair.[3] Anderson wore expensive jewelry, including a large diamond ring, carried large sums of money on his person, and kept a considerable amount of cash in the attic of the home of his mother, victim Delois Anderson. When his body was discovered, Anderson was not wearing any jewelry and did not have any cash on his person. Anderson was acquainted with both defendants, and he considered Carruthers to be a trustworthy friend. The proof showed that Anderson's trust was misplaced.

In the summer of 1993 Jimmy Lee Maze, Jr., a convicted felon, received two letters from Carruthers, who was then in prison on an unrelated conviction. In the letters, Carruthers referred to "a master plan" that was "a winner." Carruthers wrote of his intention to "make those streets pay me" and announced, "everything I do from now on will be well organized and extremely violent." Later, in the fall of 1993, while incarcerated at the Mark Luttrell Reception Center in Memphis awaiting his release, Carruthers was assigned to a work detail at a local cemetery, the West Tennessee Veterans' Cemetery. At one point, as he helped bury a body, Carruthers remarked to fellow inmate Charles Ray Smith "that would be a good way, you know, to bury somebody, if you're going to kill them. . . . [I]f you ain't got no body, you don't have a case."

Smith also testified that he overheard Carruthers and Montgomery, who also was incarcerated at the Reception Center, talking about Marcellos Anderson after Anderson had driven Carruthers back to the Reception Center from a furlough. According to Smith, when Montgomery asked Carruthers about Anderson, Carruthers told him that both Anderson and "Baby Brother" Johnson dealt drugs and had a lot of money. Carruthers said he and Montgomery could "rob" and "get" Anderson and Johnson once they were released from prison.

---

[1]They were also each convicted of three counts of especially aggravated kidnapping and one count of especially aggravated robbery of Marcellos Anderson.

[2]James Montgomery's younger brother Jonathan Montgomery was also charged on all counts involved in this case. However, several months prior to trial, Jonathan Montgomery was found hanged in his cell in the Shelby County jail.

[3]Neither Delois Anderson nor Frederick Tucker were involved in the drug trade.

When Carruthers was released from the Department of Correction on November 15, 1993, he left the Reception Center with Anderson. Carruthers accompanied Anderson to Andre Johnson's house, and received a gift of $200 cash from Anderson, Johnson, and Terrell Adair, who was present at Johnson's house.

One month later, on December 15, 1993, Smith was released from the Department of Correction. Upon his release, Smith warned Anderson and Johnson of Carruthers' and Montgomery's plans to "get them." According to Smith and Johnson, Anderson did not take the warning or the defendants' threats seriously.

In mid-December 1993, Maze, his brother and Carruthers were riding around Memphis together. They came upon Terrell Adair's red Jeep on the street in front of Delois Anderson's home where a drive-by shooting had just occurred. Adair had been injured in the shooting and was in the hospital. Jonathan "Lulu" Montgomery, James Montgomery's brother, was at the scene of the shooting, and he joined Carruthers in the back seat of Maze's car. According to Maze, Carruthers remarked to Jonathan that, "it would be the best time to kidnap Marcellos," and Jonathan asked, "which one Baby Brother or Marcellos?" Carruthers then nudged Montgomery with his elbow and said "it" was going to take place after James Montgomery was released from prison. About two weeks later, on December 31, Maze saw Carruthers loading three antifreeze containers into a car, and Carruthers indicated to Maze that the containers were filled with gasoline.

On January 11, 1994, James Montgomery was released from prison. After his release, Montgomery told "Baby Brother" Johnson that he, not Johnson, was in charge of the neighborhood. Montgomery said, "It was my neighborhood before I left, and now I'm back and its my neighborhood again." Montgomery asked Johnson if he wanted to "go to war about this neighborhood." When Johnson said, "no," Montgomery replied "You feeling now like I'm about to blow your motherf-----g brains out" and "you all need to get in line around here or we're going to war about this." Near the end of January or the first of February 1994, Johnson and Adair saw the defendants sitting together in an older model grey car down the street from Johnson's mother's home. It was late at night, between 11 p.m. and 1 a.m. When the defendants approached Johnson and Adair, Montgomery asked why they thought he was trying to harm them. Montgomery told them, "Look, I told you, we ain't got no problem with nobody in this neighborhood. We already got our man staked out. If we wanted some trouble or something, we got you right now. We'd kill your whole family." Confirming Montgomery's statement, Carruthers told them, "We already got our man staked out. You all right. If it's any problem, we'll deal with it later." Montgomery explained that he intended to take the "man's" money and drugs, and said, "if the police didn't have no body, they wouldn't have no case."

On February 23, 1994, Marcellos Anderson borrowed a white Jeep Cherokee from his cousin, Michael Harris. Around 4:30 on the afternoon of February 24, 1994, witnesses saw Marcellos Anderson and Frederick Tucker riding in the Jeep Cherokee along with James and Jonathan Montgomery. About 5 p.m. that day, James and Jonathan Montgomery and Anderson and Tucker arrived in the Jeep Cherokee at the house of Nakeita Shaw, the Montgomery brothers' cousin.

Nakeita Shaw, her four children, and Benton West, also her cousin, were present at the house when they arrived.

The four men entered the house and went downstairs to the basement. A short time later, James Montgomery came back upstairs and asked Nakeita Shaw if she could leave for a while so he could "take care of some business." Nakeita Shaw told West that she thought "they" were being kidnapped, and then she left the house with West and her children. West agreed to care for Nakeita Shaw's children while she attended a meeting.

When Nakeita Shaw returned home after the meeting, she saw only Carruthers and James Montgomery. Montgomery asked her to go pick up her children and to "stay gone a little longer." Nakeita Shaw returned home with her children before 10 p.m. The Jeep Cherokee was gone, but James Montgomery and Carruthers were still present at her home. Montgomery told Nakeita Shaw to put her children to bed upstairs and remain there until he told her he was leaving. Sometime later, Montgomery called out to Nakeita Shaw that he was leaving. She returned downstairs and saw James Montgomery, Carruthers, and the two victims, Anderson and Tucker, leave in the Jeep Cherokee. Prior to trial, Nakeita Shaw told the police that Anderson's and Tucker's hands were tied behind their backs when they left her house. While she admitted making this statement, she testified at trial that the statement was false and that she had not seen Anderson's and Tucker's hands tied when they left her home.[4]

In the meantime, around 8 p.m. on February 24, Laventhia Briggs telephoned her aunt, victim Delois Anderson. When someone picked up the telephone but said nothing, Briggs hung up. Briggs called "a couple of more times" but received no answer. Briggs was living with Delois Anderson at the time and arrived at her aunt's home around 9:00 p.m. Although Delois Anderson was not home, her purse, car, and keys were there. Food left in Anderson's bedroom indicated that she had been interrupted while eating. Briggs went to bed, assuming her aunt would return home soon. A co-worker, whom Delois Anderson had driven home around 7:15 p.m., was the last person to have seen her alive.

Chris Hines, who had known the defendants since junior high school, testified that around 8:45 p.m. on February 24, 1994, Jonathan Montgomery "beeped" him. Jonathan said, "Man, a n----r got them folks." When Hines asked, "What folks?" Jonathan replied, "Cello and them" and said something about stealing $200,000. Jonathan then indicated that he could not talk more on the telephone and arranged to meet Hines in person. Jonathan arrived at Hines' home at about 9:00 p.m. and told him, "Man, we got them folks out at the cemetery on Elvis Presley, and we got $200,000. Man, a n----r had to kill them folks." At that point, James Montgomery "beeped in" and talked with Jonathan. When the telephone call ended, Jonathan asked Hines to drive him to the cemetery. Hines

---

[4]Nakeita Shaw had also told the police before trial that she had been afraid for her life and that James Montgomery had threatened her after the investigation of this case began, stating that if he had to die for something he did not do, then "all of us needed to die." At trial, on cross-examination, she denied being afraid of James Montgomery and said it was her involvement in this case that frightened her.

refused, but he allowed Jonathan to borrow his car, which Jonathan promised to return in an hour. When the car was not returned, Hines called James Montgomery's cellular telephone at around 11 p.m. James told Hines that he did not know where Jonathan was, that Jonathan did not have a driver's license, and that the car should be returned by 4 a.m. because Jonathan was supposed to drive James to his girlfriend's house.

The Jeep Cherokee that Anderson had borrowed was found in Mississippi on February 25 around 2:40 a.m. It had been destroyed by fire. About 3:30 a.m., after he was informed of the vehicle fire by law enforcement officials, Harris telephoned Delois Anderson's home, and Laventhia Briggs then discovered that neither her aunt Delois nor her cousin Marcellos had returned home. Briggs filed a missing person report with the police later that day.

The Montgomery brothers and Carruthers did not return Hines' car until approximately 8:30 a.m. on February 25. The car was very muddy. Hines drove James Montgomery and Carruthers to Montgomery's mother's home and then drove away with Jonathan Montgomery. That morning Jonathan, whom Hines described as acting "paranoid" and "nervous," repeatedly told Hines that "they had to kill some people." About two hours later, James Montgomery and Carruthers came to Hines' home looking for Jonathan. Hines advised Carruthers and James Montgomery that he was celebrating his birthday, and he asked James Montgomery to give him a birthday present. James agreed to give Hines twenty dollars after he picked up his paycheck, and James also agreed to have Hines' car washed immediately as a birthday present.

Hines, the Montgomery brothers, and Carruthers drove to a carwash, and James Montgomery paid an unidentified elderly man to clean the car. The man cleaned the interior of the car and the trunk of the car. Neither Carruthers nor James Montgomery supervised the cleaning of the car. After Jonathan Montgomery abruptly left the carwash, Carruthers and James Montgomery asked Hines what Jonathan had told him, but Hines did not tell them. Several days later James Montgomery came to Hines' home and offered Hines an AK-47 assault rifle because Montgomery said he had "heard that Hines was into it with some people on the street." James Montgomery told Hines the rifle had "blood on it." Hines testified that he interpreted this statement to mean that someone had been shot with the weapon.

On March 3, 1994, about one week after a missing person report was filed on Delois and Marcellos Anderson, Jonathan Montgomery directed Detective Jack Ruby of the Memphis Police Department to the grave of Dorothy Daniels at the Rose Hill Cemetery on Elvis Presley Boulevard.[5] Daniels' grave was located six plots away from the grave site of the Montgomery brothers' cousin. Daniels had been buried on February 25, 1994. Pursuant to a court order, Daniels' casket was

---

[5]Although the jury did not hear proof about why Jonathan Montgomery directed Detective Ruby to the grave, the record of pre-trial and jury-out hearings reflects that the investigation had focused upon the Montgomery brothers because they were seen with two of the victims around 5:00 p.m. on the day of the murders. When the police questioned Jonathan Montgomery, he gave conflicting statements, but eventually directed Detective Ruby to the grave where the bodies were buried.

disinterred, and the authorities discovered the bodies of the three victims buried beneath the casket under several inches of dirt and a single piece of plywood.

An employee of the cemetery testified that a pressed wood box or vault had been placed in Daniels' grave during working hours on February 24 and that it would have taken at least two people to remove the box. Daniels' casket had been placed in the grave inside the box on February 25, and, according to Dr. Hugh Edward Berryman, one of the forensic anthropologists who assisted in the removal of the bodies from the crime scene, there was no evidence to suggest that Daniels' casket had been disturbed after she was buried. Thus, it can be inferred that the bodies of the three victims were placed in the grave and covered with dirt and a piece of plywood prior to the casket being placed in the grave.

Dr. O. C. Smith, who helped remove the bodies from the grave and who performed autopsies on the victims, testified that, when found, the body of Delois Anderson was lying at the bottom of the grave and the bodies of the two male victims were lying on top of her. The hands of all three victims were bound behind their backs. Frederick Tucker's feet were also bound and his neck showed signs of bruising caused by a ligature. A red sock was found around Delois Anderson's neck. Marcellos Anderson was not wearing any jewelry. Dr. Smith testified that Delois Anderson died from asphyxia caused by several factors: the position of her head against her body, dirt in her mouth and nose, and trauma from weight on her body. Frederick Tucker had received a gunshot wound to his chest, which would not have been fatal had he received medical care. He had also suffered injuries from blunt trauma to his abdomen and head resulting in broken ribs, a fractured skull, and a ruptured liver. Dr. Smith opined that Tucker was shot and placed in the grave, where the force of compression from being buried produced the other injuries and, along with the gunshot wound, caused his death. According to Dr. Smith, Marcellos Anderson had been shot three times: a contact wound to his forehead that was not severe and two shots to his neck, one of which was also not serious. However, the gunshot causing the other neck wound had entered Anderson's windpipe and severed his spinal cord, paralyzing him from the neck down. This wound was not instantaneously fatal. Anderson had also suffered blunt trauma to his abdomen from compression forces. Dr. Smith opined that each victim was alive when buried.

Defendant James Montgomery presented no proof. Carruthers, acting pro se, called several witnesses to rebut the testimony offered by the State, primarily by attacking the credibility of the State's witnesses.

A health administrator at the Mark Luttrell Reception Center testified that, because of an injury to his arm, Carruthers had been given a job change on October 6, 1993, and had not worked at the cemetery after that date. Another official at the Reception Center testified that Carruthers was not released on furlough after Montgomery arrived at the Reception Center on November 4, 1994. This proof was offered to impeach Smith's testimony that Montgomery and Carruthers discussed robbing and getting Marcellos Anderson after Anderson drove Carruthers back to the Reception Center following a furlough. An investigator appointed to assist Carruthers with his defense testified that he had interviewed Maze, who admitted he did not know anything about the "master plan" to

which Carruthers referred in the letters until Carruthers was released from prison. On cross-examination, the investigator admitted that Maze said that when he was released from prison, Carruthers had explained that the master plan involved kidnapping Marcellos Anderson. Carruthers' brother and another witness testified that Jonathan Montgomery was not at the scene of the drive-by shooting involving Terrell Adair. This proof was offered to impeach Maze's testimony that Carruthers and Jonathan Montgomery discussed kidnapping Marcellos on the day that Terrell Adair was shot. Another witness, Aldolpho Antonio James testified that he and Carruthers had been visiting a friend between the hours of 1:00 a.m. and 2:00 a.m. the day before these homicides were first reported on the news. This testimony was offered to provide at least a partial alibi for Carruthers for the early morning hours of February 25, 1994. However, on cross-examination, James admitted that he did not know the exact date he and Carruthers had been together.

Carruthers also called Alfredo Shaw as a witness. After seeing a television news report about these killings in March of 1994, Alfredo Shaw had telephoned CrimeStoppers and given a statement to the police implicating Carruthers. Alfredo Shaw later testified before the grand jury which eventually returned the indictments against Carruthers and Montgomery. Prior to trial, however, several press reports indicated that Alfredo Shaw had recanted his grand jury testimony, professed that the statement had been fabricated, and intended to formally recant his grand jury testimony when called as a witness for the defense. Therefore, when Carruthers called Alfredo Shaw to testify, the prosecution announced that if he took the stand and recanted his prior sworn testimony, he would be charged with and prosecuted for two counts of aggravated perjury. In light of the prosecution's announcement, the trial court summoned Alfredo Shaw's attorney and allowed Alfredo Shaw to confer privately with him. Following that private conference, Alfredo Shaw's attorney advised the trial court, defense counsel, including Carruthers, and the prosecution, that Alfredo Shaw intended to testify consistently with his prior statements and grand jury testimony and that any inconsistent statements Alfredo Shaw had made to the press were motivated by his fear of Carruthers and by threats he had received from him.

Despite this information, Carruthers called Alfredo Shaw as a witness and as his attorney advised, Shaw provided testimony consistent with his initial statement to the police and his grand jury testimony. Specifically, Alfredo Shaw testified that he had been on a three-way call with Carruthers and either Terry or Jerry Durham, and during this call, Carruthers had asked him to participate in these murders, saying he had a "sweet plan" and that they would each earn $100,000 and a kilogram of cocaine. Following his arrest for these murders, Carruthers was incarcerated in the Shelby County Jail along with Alfredo Shaw, who was incarcerated on unrelated charges. Carruthers and Alfredo Shaw were in the law library when Carruthers told Alfredo Shaw that he and some other unidentified individuals went to Delois Anderson's house looking for Marcellos Anderson and his money. Marcellos was not there when they arrived, but Carruthers told Delois Anderson to call her son and tell him to come home, "it's something important." When Anderson arrived, the defendants forced Anderson, Tucker, who was with Anderson, and Delois Anderson into the jeep at gunpoint and drove them to Mississippi, where the defendants shot Marcellos Anderson and Tucker and burned the jeep. According to Alfredo Shaw, the defendants then drove all three victims back to Memphis in a stolen vehicle. Alfredo Shaw testified that, after they put Marcellos

Anderson and Tucker into the grave, Delois Anderson started screaming and one of the defendants told her to "shut up" or she would die like her son and pushed her into the grave. Carruthers also told Alfredo Shaw that the bodies would never have been discovered if "the boy wouldn't have went and told them folks." Carruthers told Alfredo Shaw that he was not going to hire an attorney or post bond because the prosecution would then learn that the murders had been a "hit." Carruthers told Alfredo Shaw that Johnson also was supposed to have been "hit" and that Terry and Jerry Durham were the "main people behind having these individuals killed." Carruthers said that the Durhams wanted revenge because Anderson and Johnson had previously stolen from them.

In response to questioning by Carruthers, Alfredo Shaw acknowledged that he had told the press that his statement to police and his grand jury testimony had been fabricated, but said he had done so because Carruthers had threatened him and his family. According to Alfredo Shaw, one of Carruthers' investigators had arranged for a news reporter to speak with him about recanting his grand jury testimony.

As impeachment of his own witness, Carruthers called both Jerry and Terry Durham, twin brothers, as witnesses. The Durhams denied knowing Alfredo Shaw and said they had never been party to a three-way telephone call involving Alfredo Shaw and Carruthers. Carruthers also called attorney AC Wharton who testified that he was initially retained by Carruthers' mother to represent her son on these murder charges, but was required to withdraw because of a conflict of interest. This testimony was offered to impeach Alfredo Shaw's statement that Carruthers had said he was not going to hire an attorney or post bond. Finally, Carruthers called an administrative assistant from the Shelby County jail who testified that jail records, indicated that Alfredo Shaw was not in the law library at the same time as Carruthers in either February or March of 1994. According to jail records, Alfredo Shaw was in protective custody for much of that time and, as a result, would have been escorted at all times by a guard. However, on cross-examination, this witness admitted that the jail records regarding the law library were not always complete or accurate and that Alfredo Shaw had been housed outside of protective custody from mid-March to early April 1994 which would have afforded him the opportunity to interact with Carruthers. The record reflects that Alfredo Shaw came forward and provided a statement to police on March 27, 1994 and that the indictments were returned on March 29, 1994.

Based upon this proof, the jury found each defendant guilty beyond a reasonable doubt of three counts of first degree murder, three counts of especially aggravated kidnapping, and one count of especially aggravated robbery.

**The Sentencing Phase**

The trial proceeded to the sentencing phase. The State relied upon the proof presented during the guilt phase of the trial and also introduced evidence to show that Carruthers had been previously convicted of aggravated assault and that James Montgomery had two previous convictions for robbery with a deadly weapon and one conviction for assault with intent to commit robbery with a deadly weapon. The proof showed that Montgomery was only seventeen years old

-8-

at the time he committed these previous offenses and that all of these previous convictions arose from a single criminal episode.

The State also recalled Dr. Smith who testified that none of the victims died instantaneously and that all suffered as a result of their separate injuries and being buried alive. Although Anderson was paralyzed below his chest, Dr. Smith testified that he would have felt some of the effects of the trauma to his airway and particularly his windpipe, which is according to Dr. Smith, a very painful injury. According to Dr. Smith, the bullet wound to Anderson's head would not have been fatal had he received proper medical attention and would not necessarily have caused unconsciousness. In addition, Anderson would have been able to breathe after the spinal cord wound, but the wound would have bled into his airway and his lungs, making breathing very difficult. Dr. Smith said that Anderson literally would have been "drowning on his own blood."

With respect to Frederick Tucker, Dr. Smith testified that the gunshot wound to his chest fractured two ribs and pierced his lung, but would not have been fatal had he obtained medical treatment. Because the wound bled into Tucker's lungs and abdominal cavity, Dr. Smith testified that Tucker also was "breathing blood" and "starving for oxygen." Tucker also had multiple internal injuries, according to Dr. Smith, that resulted from some weight being placed on his body. However, Dr. Smith opined that neither the weight of Anderson's body alone, nor the weight of Anderson's body combined with the plywood and dirt would have produced the extensive internal injuries sustained by Tucker and that some additional weight or force had been applied to his body.

Dr. Smith testified that Delois Anderson also had sustained several injuries, including a scalp tear on the back of her head inflicted two to six hours before her death, an injury to her forehead consistent with her position in the grave, and injuries to her neck consistent with manual strangulation. None of these injuries would have caused death had she been afforded medical treatment. Dr. Smith testified that Delois Anderson died from asphyxia caused by the position of her head against her body, dirt in her mouth and nose, and trauma from weight on her body.

As mitigating evidence Montgomery presented the testimony of his cousin, Nakeita Shaw, that she and Montgomery had a close relationship during their childhood and teenage years, that they had attended elementary school together, that Montgomery had been her "brother" and "protector," and that they had continued their close relationship as adults. Nakeita Shaw said that Montgomery has other siblings, including a thirty-year-old sister, a twenty-six-year-old brother, and a fourteen-year-old brother. Nakeita Shaw said that she still loves Montgomery very much, and she asked the jury to spare his life. Montgomery's aunt, Mattie Calhoun, also testified on his behalf. Calhoun said that Montgomery was an average student, that he had a very poor relationship with his father, that another man had helped to rear Montgomery when his father abandoned him at age five or six, and that this individual had died in 1986. Calhoun told the jury that the prosecution had the "wrong people" and begged the jury to spare Montgomery's life. Lastly, Montgomery testified on his own behalf about how he and his brothers and sisters were raised by his mother in Memphis and about how he last saw his father, who was still alive, when he was five years old. He testified that he had spent slightly over nine years in the penitentiary for previous convictions, that he had a job when he

was released in January 1994, and that at the time of these crimes his ten-year-old son was living with him. Montgomery proclaimed his innocence and asked the jury to spare his life.

Carruthers presented the testimony of Bishop Richard L. Fiddler, who had been involved in prison ministry for twenty years and had visited Carruthers while he was incarcerated awaiting trial. Fiddler believed that Carruthers was honest and straightforward, was "a person of quality and worth," and was very upset about the victims' deaths. According to Fiddler, Carruthers viewed the trial as his opportunity to be vindicated. Fiddler asked the jury to spare Carruthers' life. Carruthers' sister, Tonya Yvette Miller, a counselor at the Shelby County adult offender center, testified that their mother raised four children on her own in one of the worst housing projects in Memphis and that, as the oldest son, Carruthers was the "man of the household." Miller admitted that her brother had fallen into bad company and had a hot temper but testified that he never planned to do anything wrong but acted out of "anguish and anger." She also stated that her brother had been raised to tell the truth. Miller told the jury that if she believed her brother had committed these crimes she would be the first person to say that he deserved the death penalty, but Miller said that Carruthers was innocent and that, therefore, he "does not deserve the death sentence." Testifying on his own behalf, Carruthers asserted that he was innocent of the crimes and did not deserve to die. He said he would not have killed his friend because he "wasn't raised like that."

## Jury Findings

Based on this proof, the jury found the following aggravating circumstances as to each defendant on each of the three murder convictions: (1) "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" (2) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" (3) "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy; or unlawful throwing, placing or discharging of a destructive device or bomb;" (4) "[t]he defendant committed mass murder, which is defined as the murder of three (3) or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan." Tenn. Code Ann. § 39-13-204(2), (5), (7), and (12) (Supp. 1994).[6] Finding that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury imposed the death sentence as to each defendant for each of the three murder convictions.[7]

---

[6]Two of these aggravating circumstances have been slightly amended since this case was tried. See Tenn. Code Ann. § 39-13-204(i)(7) and (12) (1999 Supp.).

[7]Each of the defendants was sentenced as a multiple, Range II offender to forty (40) years on each of the three convictions of especially aggravated kidnapping and on the especially aggravated robbery conviction. The trial judge ordered that two of the sentences for especially aggravated kidnapping run concurrent to the death penalty with all other sentences running consecutive to the death penalty.

## Appellate Review

On direct appeal to the Court of Criminal Appeals, the defendants challenged both their convictions of first degree murder and their death sentences, raising numerous claims of error. After fully considering the defendants' claims, the Court of Criminal Appeals affirmed the convictions and sentences. Pursuant to statute,[8] the case was thereafter docketed in this Court.

The defendants raised numerous issues in this Court, and after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendants and the State, this Court entered an order setting the cause for oral argument and designating ten issues for oral argument. See Tenn. S. Ct. R. 12.[9]

After carefully and fully reviewing the record, the briefs of counsel, and the relevant legal authority, we conclude that none of the assigned errors require reversal of defendant Carruthers' convictions or sentences. Moreover, with respect to defendant Carruthers, we have determined that the evidence supports the jury's findings as to aggravating and mitigating circumstances, that the sentences of death were not imposed in an arbitrary fashion, and that the sentences of death are not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crimes and the defendant. Accordingly, defendant Carruthers' convictions for first degree murder and sentences of death are affirmed.

However, we also have determined that defendant Montgomery should have been granted a severance and that the failure to grant a severance in this case resulted in prejudicial error requiring a new trial. Accordingly, we reverse Montgomery's convictions and sentences and remand his case for a new trial.

## Analysis
### Dismissal of the Murder Indictments

Defendant Carruthers first contends that the indictments should have been dismissed because they were based upon what he terms "the admittedly questionable" testimony of Alfredo Shaw before the grand jury. Carruthers also argues that he was entitled to a transcript of the grand jury proceedings. We disagree.

---

[8] "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure." Tenn. Code Ann. § 39-13-206(a)(1).

[9] Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

It has long been the rule in this State that the sufficiency and legality of the evidence considered by the grand jury is not subject to judicial review.[10] Where an indictment is valid on its face, it is sufficient to require a trial of the charge on the merits to determine the guilt or innocence of the accused, regardless of the sufficiency or legality of the evidence considered by the grand jury.[11]

As the United States Supreme Court recognized in Costello v. United States, 350 U.S. 359, 361, 76 S. Ct. 406, 408 100 L.Ed. 397 (1956):

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The results of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury.

See also Burton, 214 Tenn. at 16, 377 S.W.2d at 903 (quoting Costello with approval). We decline to adopt such a rule. Carruthers' claim that the indictments must be dismissed because Alfredo Shaw's testimony before the grand jury was not trustworthy is without merit.[12] This matter is not subject to judicial review.

Also without merit is Carruthers' claim that he was entitled to a transcript of the grand jury proceedings. With certain limited exceptions that do not apply in this case general law mandates that grand jury proceedings remain secret. See Tenn. R. Crim. P. 6(k)(1) (stating that such proceedings are secret); Tenn. R. Crim. P. 6(k)(2) (allowing disclosure of grand jury proceedings to ascertain if the testimony of a witness before the grand jury is consistent with the testimony of the witness at trial and allowing disclosure of grand jury testimony of any witness charged with perjury); Tenn. R. Crim. P. 16(a)(3) (requiring the state to provide as discovery to the defendant any "recorded testimony of

---

[10]Recently in State v. Culbreath, __ S.W.3d __(Tenn. 2000), we held that dismissal of an indictment is appropriate where a prosecutor's use of a private attorney who received substantial compensation from a private, special interest group created a conflict of interest and an appearance of impropriety and violated the defendants' right to due process under the Tennessee Constitution. Carruthers does not allege prosecutorial misconduct, and the record in this case would not support such an allegation.

[11]See Burton v. State, 214 Tenn. 9, 15-18, 377 S.W.2d 900, 902-904 (1964) (refusing to dismiss an indictment that was based upon inadmissible hearsay); State v. Dixon. 880 S.W.2d 696, 700 (Tenn. Crim. App. 1992) (refusing to dismiss an indictment that was based on evidence that had been suppressed under the Fourth Amendment); State v. Gonzales, 638 S.W.2d 841, 844-45 (Tenn. Crim. App. 1982) (refusing to dismiss an indictment that was based upon unsworn testimony to the grand jury); State v. Grady, 619 S.W.2d 139, 140 (Tenn. Crim. App. 1979) (refusing to dismiss an indictment that was based upon inadmissible hearsay testimony); State v. Northcutt, 568 S.W.2d 636, 639 (Tenn. Crim. App. 1978) (refusing to dismiss an indictment because of a question asked of a witness by the foreman of the grand jury); Gammon v. State, 506 S.W.2d 188, 190 (Tenn. Crim. App. 1973) (refusing to dismiss an indictment that was based upon inadmissible hearsay testimony); Casey v. State, 491 S.W.2d 90, 91 (Tenn. Crim. App. 1972) (same); State v. Marks, 464 S.W.2d 326, 327 (Tenn. Crim. App. 1970) (same); Parton v. State, 455 S.W.2d 645, 648 (Tenn. Crim. App. 1970) (same).

[12]The record reflects, however, that Alfredo Shaw's testimony at trial when called as a witness by defendant Carruthers apparently was consistent with his testimony before the grand jury.

the defendant before a grand jury which relates to the offense charged"); cf. Tiller v. State, 600 S.W.2d 709, 712 (Tenn. 1980) (discussing the secrecy requirement that applies to grand jury proceedings).[13]

## Forfeiture of Counsel

We begin our analysis of this issue by summarizing the events that culminated in Carruthers being required to represent himself at trial. As previously stated, these crimes occurred on February 24 or 25, 1994. Carruthers' family initially retained AC Wharton, Jr., to represent him. Wharton was allowed to withdraw on March 19, 1994, because of a conflict of interest. On May 31, 1994, the trial court appointed Larry Nance to represent Carruthers. The State filed a notice of intent to seek the death penalty on July 8, 1994. At a hearing held on July 15, 1994, the trial court scheduled a pre-trial motions hearing for September 30, 1994 and set the case for trial on February 20, 1995. Carruthers was present at this hearing and asked the trial court, "I'd like to know why this is being dragged out like this. I asked Mr. Nance if we can go forward with a motion of discovery and he's asking for a reset. And I'd like to know why." Nance informed the court that he was planning to visit the prosecutor's office later in the week to review the discoverable materials and evidence. The trial judge then advised Carruthers in pertinent part as follows:

> [G]iven the fact that the trial isn't until February, we're setting the next Court date in September for the arguing of motions. Between now and September, your attorney and the attorneys representing your two co-defendants can get with the prosecutors and can obtain their discovery. They're all excellent attorneys. And they'll all do that. And once they've obtained the discovery, they'll meet with their clients and they'll file appropriate motions, which will be heard on September 30th, which will still be well in advance of the trial date, which will give everyone ample time to then evaluate the case, after the motions have been heard and ruled on. So given the fact that we can't get a three-defendant capital case that's still in the arraignment stage to trial any earlier than February, there's plenty of time for your attorneys to meet with the prosecutors, get the discovery, meet with the clients, file motions, argue motions. Just because he hadn't done it yesterday, because you want him to have it done yesterday, doesn't mean that he's not working on your case diligently and properly. He'll have everything done well in advance of the next Court date. And so, you know, he may not do it the very moment you want it done, but you're going to have to work with him on that because there's ample time for him to get it done.

---

[13] It appears from the record that Carruthers was provided with a copy of the transcription of Shaw's testimony before the grand jury. Carruthers had left one copy in his cell on the day Shaw testified and was given another copy by the prosecutor immediately prior to Shaw's testimony. In addition, the trial court mentioned "the testimony in front of the grand jury" when he was discussing the "three or four different statements" Carruthers was using during his direct examination of Alfredo Shaw.

On August 12, 1994, the trial court appointed Craig Morton to assist Nance.[14] When the pre-trial motions hearing convened on September 30, 1994, all defense attorneys involved in the case requested a continuance until November 14, 1994 so that additional pre-trial motions could be filed. The trial judge agreed to continue the hearing and also indicated that, where appropriate, a pre-trial motion filed on behalf of one defendant would be applied to all defendants without a specific request.

Because the trial judge had received "an abundance of correspondence from both Mr. Montgomery and Mr. Carruthers expressing concern about the pretrial investigation that has been conducted by their attorneys," the defendants were brought into open court and advised of the continuance. The trial judge then asked the attorneys to "state, for the record, the work that they've done and the work they intend to continue doing on behalf of their client." Each team of defense lawyers reported to the trial judge on the work that had been completed and on the work they intended to complete in the following days.

In particular, Nance indicated that he had inspected a majority of the physical evidence, filed six or seven motions, issued subpoenas for approximately eight witnesses, interviewed several of the one-hundred witnesses listed by the State,[15] met with Carruthers in lock-up at the courtroom on two separate occasions, met with Carruthers' family, and spent approximately twenty-five hours on the case. Nance admitted that "some enmity" had developed between him and Carruthers, but indicated that he believed the problem could be resolved.

Carruthers also was allowed to voice his complaints about his attorneys on the record, and his primary complaint was that his attorneys had not met with him as often as he had expected. After hearing the comments of both Nance and Carruthers, the trial judge concluded as follows:

> in my opinion, what has been done thus far in this case, given the fact that there are still six more weeks before the next motion date, and then a full three months beyond that before the trial date, is appropriate and well within the standards of proper representation.

On October 21, 1994, the trial court approved payment for investigative services for Carruthers and authorized competency evaluations for both defendants. Morton informed the trial

---

[14]As the trial court predicted, the record reflects that both Nance and Morton filed numerous pre-trial motions on behalf of Carruthers, including motions for discovery, for investigative services, for a mental examination, to exclude certain evidence, for individual voir dire, for impeachment evidence, for a competency evaluation of prosecution witnesses, for another mental evaluation of Carruthers, to dismiss the indictments, to suppress statements of co-defendant Jonathan Montgomery, for a severance, for expert services, and a notice of an alibi defense.

[15]Although the witness list contained the names of one hundred people, the State previously had indicated that it had no intention of calling one hundred witnesses and was simply providing the name of every person that had been mentioned in the investigation as a means of giving the defense discovery.

court that the investigator, Arthur Anderson, had attempted twice to meet with Carruthers at the Shelby County jail and that Carruthers had refused to meet with him on both occasions.

On November 14, 1994, Carruthers filed his first motion for substitution of counsel. Four days later, on November 18, Morton asked the trial court to appoint a different investigator who would take a more aggressive approach. The trial court agreed to appoint a new investigator and continued the hearing date on the pre-trial motions until December 16, 1994. On November 23, 1994, Morton advised the trial court that he had retained the services of Premier Investigation.

Although the record does not reflect that a hearing was held, the trial court allowed Nance to withdraw from representing Carruthers on December 9, 1994.[16] According to statements made by the trial court at a later hearing, Nance was allowed to withdraw because of "personal physical threats" made by Carruthers that escalated to the point that Nance did not "feel comfortable or safe, personally safe, in continuing to represent Mr. Tony Carruthers."

Coleman Garrett was appointed to replace Nance and represent Carruthers along with Morton. The trial judge also authorized James Turner, a third attorney, to assist the defense as an investigator. Both counsel and Carruthers continued to file pre-trial motions. Some of these motions were heard on December 16, 1994, and another hearing was scheduled for January 30, 1995. On that date, Garrett and Morton appeared and presented argument on over seventeen motions. At this hearing, the trial judge agreed to reschedule the trial from February of 1995 to September 5, 1995. At a hearing on May 1, 1995, Garrett and Morton presented argument on several more pre-trial motions including a motion to dismiss the indictments, a motion to sever, and a request for expert services to analyze an audio-tape of Nakeita Shaw's statement. On May 5, investigator/attorney James Turner was allowed to withdraw because he was a solo practitioner and could not maintain his practice and effectively perform the investigation needed on the case. However, the trial court appointed another attorney, Glenn Wright, to act as investigator. On June 2, 1995, Garrett again argued that the indictments should be dismissed due to Shaw's allegedly false testimony before the grand jury.

On June 23, 1995, Garrett, Morton, and Wright sought and were granted permission to withdraw by the trial court. The record reflects that Carruthers also filed a motion for substitution of counsel. At a hearing on July 27, 1995, the trial court appointed William Massey and Harry Sayle to represent Carruthers. During this hearing, the trial judge commented as follows:

> All right. I understand that these three defendants are on trial for their lives
> and that these are the most serious of charges and that they are all concerned that they
> are well represented and properly represented, and it's everyone's desire to see to it

---

[16]We note, as did the Court of Criminal Appeals, that in addition to his motion for substitution of counsel, Carruthers filed many pro se motions throughout the time he was represented by Nance and Morton. Many of the pro se filings are similar or identical to the motions filed by counsel for Carruthers or by counsel for co-defendant James Montgomery.

that they are well represented and properly represented. And toward that end, efforts are being made that they are represented by attorneys that have enough experience to handle this type of case and by attorneys that can establish a rapport with their clients that would allow them to represent their clients well.

We have gone through several attorneys now in an effort to accommodate the defendants' requests in that regard, but at some point–and in my opinion, each of the attorneys and each of the investigators that has represented these defendants that has been relieved have been eminently qualified to do the job, but I have allowed them to be relieved for one reason or another.

I want the record to be perfectly clear at this point because of some suggestions that have already been raised by some of the correspondence that I have received from Mr. Carruthers, and all of it, by the way, will be made a part of the record. But Mr. Carruthers has suggested, in his correspondence, that some of the previous attorneys have been relieved because they weren't capable or competent to do the job. And that is, in my opinion, at least–my humble opinion as the judge in this case–absolutely and totally an inaccurate statement. The attorneys that have been relieved thus far have been fully capable and fully competent and had been doing an outstanding job, but for a variety of reasons, I've allowed them to withdraw from the case.

\* \* \* \*

Mr. Carruthers has raised, through his correspondence, and apparently through direct communication with his previous attorneys, certain matters that are pretty outrageous suggestions, but because of the nature of the matters that he's raised, the attorneys that represented him previously felt that an irreparable breach had occurred between their ability–between Mr. Carruthers and themselves–effecting their ability to continue to represent them. And at some point–and that could well have been the point, but it wasn't. But at some point these matters that are raised by the defendants cannot continue to be used to get new counsel because it gets to be a point where they're–it's already well beyond that point, but, obviously, at some point, gets to the point where they're manipulating the system and getting what they want–Mr. Carruthers, sit still, please, or you can sit back there –gets to the point where they're manipulating the system and getting trial dates and representation that they want and are calling the shots. That's another matter that's been raised by Mr. Carruthers in some of his correspondence, that he wants his attorneys to know that he's the man calling the shots in this case, and he's the man to look to.

Well, of course, again, it's a free country, and he can say whatever he wants, and he can think whatever he wants, but as far as I'm concerned–and this applies to all three defendants and any defendants that come through this court that are

-16-

represented by counsel–and this gets back to what Mr. McLin alluded to earlier–the attorneys are calling the shots in this case. They are trying the case except for certain areas where the defendant has the exclusive and final say, such as areas of whether he wants to testify or not and that sort of thing. The attorneys are in here representing these clients and will do so to the best of their ability. They are the ones who have been to law school. They are the ones that have been through trial many times before, and they're the ones that are here for a reason, and that reason is to represent these individuals. And, so you know, if there's a conflict between the attorney and client with regard to how to proceed in the case, you all resolve it as best you can, but ultimately the attorney is trying the case. And, you know, we don't pull people in off the sidewalk to try these cases, and the reason we don't is because of certain things that they need to learn and certain experiences they need to have professionally before they're prepared to try these cases. So they're here for that reason and for that purpose.

* * * *

So that gets me to the reason for our being here. <u>Because of the matters raised by Mr. Carruthers, I have granted the request of his previous two attorneys and investigator reluctantly because, in my opinion, they were doing an outstanding job of representing Mr. Carruthers and his interests.</u>

* * * *

Because of the most recent rash of allegations raised by Mr. Carruthers in his many letters that he's sent me–I assume he's sent copies of the letters to his counsel and to others, but I've certainly got them, and they will be made a part of the record. And because of the types of things he alleged in those letters and the position that it put his previous attorneys in, and their very, very strong feelings about not continuing to represent Mr. Carruthers under those circumstances, I have reluctantly agreed to let them withdraw.

And in an effort again to get attorneys who I'm satisfied have the experience and the willingness to handle a case of this seriousness, I have approached and am inclined to appoint Mr. Harry Sayle, who is out of town this week and couldn't be here today but who indicated he would be willing to take the case on, and Mr. Bill Massey, to represent Mr. Carruthers.

* * * *

<u>And as I have stated, I'm running out of patience with regard to these different issues–and I use that word advisedly–being raised by the clients with regard to any objections they have with regard to their attorneys. And as far as I'm</u>

-17-

> concerned, these are the attorneys that will represent these men at trial. It's going to have to be one gigantic conflict—one gigantic and real proven, demonstrated conflict before any of these men will be relieved from representation in this case. There will be no more perceived conflicts, no more unfounded, wild allegations raised through correspondence, no more dissatisfaction with how my attorney is handling my case for anybody to be relieved in this case.
>
> These are the attorneys, gentlemen. You either work with them or don't. It's up to you. But they're the men that are going to be representing you at trial.

(Emphasis added.) Consistent with prior practice, the trial court approved an initial $1000 expenditure for investigative services for Carruthers' newly appointed defense team and conditioned further funding upon a specific showing of necessity by the investigator. Massey indicated that he preferred to use his own investigator rather than an attorney; therefore, Arthur Anderson, who previously had been employed on the case, was retained.

The trial court approved additional funding for investigative services on August 11, August 31, and again on September 27, 1995. Also, due to his recent appointment to the case, Massey requested and was afforded a trial continuance until January 8, 1996. Like previous counsel, Massey and Sayle filed many pre-trial motions on behalf of Carruthers. By November 17, 1995, Massey informed the trial court that all necessary and appropriate pre-trial motions had been filed.

However, about a month later, on December 19, 1995, Massey filed a motion requesting permission to withdraw as counsel. As grounds for the motion, Massey stated that his relationship with Carruthers had "deteriorated to such a serious degree that [counsel] can not provide effective assistance as required by state and federal law. . . . Counsel's professional judgment cannot be exercised solely for the benefit of Defendant, as counsel fears for his safety and those around him." Attached to the motion were several letters Carruthers had sent to Massey, both at his home and at his office in late November and early December of 1995. In the letters, Carruthers accused Massey of lying,[17] and of being on drugs,[18] threatened counsel,[19] and expressed overall dissatisfaction with counsel's handling of the case.[20] Massey made the following statements to the trial court at the hearing on his motion to withdraw:

---

[17]For example, in a letter dated November 22, 1995, Carruthers said: "You have violated the code of ethics by lying to me and my co-defendant James Montgomery . . . ."

[18]In a letter dated December 15, 1995, Carruthers said, "I don't know if you are on that COCAINE again but don't let the drug alter you [sic] ability to see the truth and no [sic] the truth."

[19]In a letter dated December 7, 1995, Carruthers said, "All I tell you is to do you [sic] want to do, and I'll do what I HAVE TO DO! Point blank!"

[20]In a letter dated December 5, 1995, Carruthers said, "You have violated several ethic codes with your style and tactics."

I would just say that in 15 years of practicing law, I have never ever made a motion of this nature. I have never–I've never found it difficult to advocate on behalf of a case. I wouldn't find it difficult to advocate on behalf of this case. I do at this point, however, find it very difficult to advocate on behalf of Mr. Carruthers. And that is simply because he's made it that way. If I were receiving letters that merely stated I was incompetent and that I wasn't handling his case right, and those type of letters–we all get those time to time–I don't mind those. Those don't bother me. When I have letters that come to me that are threatening, when I have telephone calls that come to my office that are threatening the safety of me and my staff and those around me, I have real problems with that. It's gotten so bad, your Honor, that my secretary is having nightmares. The last call Mr. Carruthers made is Exhibit E to this verified motion. She called me in absolute tears crying uncontrollably, hysterically crying over his antics. That's the same way he's been doing me. I just haven't broken down and started crying about it. But I do have very, very strong, such strong personal reservations as I have never experienced before as an advocate. Your honor, in advocating cases, particularly capital cases, I find the first thing I have to do to be persuasive is to believe. I have to believe and I have to feel. Because if I don't believe and I don't feel and I'm not sincere, I cannot impart that to a jury. They see my insincerity. They see just words, a parrott-like proficiency as opposed to feeling. They don't act on that. They shut that out. That's been my experience. And I don't believe that that feeling, I know that I can't advocate. I've lost my will to advocate on this case. I don't have any doubt about that at this point. I don't have any doubt. I'll tell you as an officer of this court. I don't have any doubt that would be a major problem. And despite Mr. Carruthers threats and antics, I care for the integrity of the system. I care that his rights are protected even when he tries to destroy them himself and impair them. And I don't know what the Court's answer is. I know that the Court is in a very difficult position here. Obviously, it's very clear what the ploy is. It's very clear that we're never going to get to trial like this. And if we do, then there's going to be a record made for ineffective assistance of counsel. And they believe, Mr. Carruthers believes, that doing all of these things is going to make him a record as opposed to doing things from a legal standpoint in the courtroom. There are motions, objections at trial and through the proper avenues that the courts of appeals will recognize as a legal basis for a reversal. But we've gotten outside the legal area in this case and we've gone into the area of intimidation, threats.

(Emphasis added.) Despite Massey's argument, the trial judge denied Massey's motion, stating as follows:

With regard to Mr. Massey's concerns, I certainly believe that everything Mr. Massey has stated in his motion is factually accurate and correct. I don't have any reason to doubt that his secretary received the phone call that she says she received in the memo she prepared, or that any of these other things transpired. But I do think and I do agree with Mr. Massey's characterization that these efforts by Mr.

<u>Carruthers are a part of an overall ploy on his part to delay the case forever until</u> <u>something happens that prevents it from being tried.</u>

* * * *

In my opinion, to try to make the record reflect as clearly and accurately as possible the fact that the system is doing everything it can to make sure that Mr. Carruthers is properly and thoroughly represented in this case. And Mr. Carruthers may step out to the back. <u>He just was pointing to Mr. Massey with some sort of threatening gesture.</u> And he's going to sit in the back for the remainder of this hearing. Put him in the back room and keep him back there. Lock the door. Mr. Montgomery, you will join him in a minute if you choose to conduct yourself in that manner as well. <u>The system has done all it can, in my opinion, to make sure that Mr. Tony Carruthers is well represented.</u> And I've tried to be as patient as I can be in listening to the concerns of defense counsel and investigators in making sure that no conflict existed in the representation of either of these men. The specific reasons, the narrow specific reasons for the excusal of the previous attorneys and investigators differ a little bit from those complaints that Mr. Massey has raised today. And so when Mr. Massey says '[t]hat just because I'm the 4th or 5th attorney in line doesn't mean that I now have to be stuck, in effect, in representing him just because others have been relieved and the Court is anxious to get the case tried. My complaints are as valid as theirs were. And if they were relieved, then I should be relieved as well.' And I understand that position. But first of all I'll respond to that by saying their complaints were a little bit different, and I'm not going to go through them on the record now. The record is clear in those instances. One envelope is sealed with several letters that will reveal what those complaints were and the complaints from attorneys prior to that were a little bit different in nature. Not to minimize the seriousness of Mr. Massey's complaints, but those complaints were a little bit different. And so its not that he just happens to be the 5th attorney in line, and he's the one that is going to quote, get stuck, representing Mr. Carruthers. Their complaints were a little bit different. And factually there are some distinctions that can be drawn between the complaints that they had and the complaints that you've voiced.

(Emphasis added.) The trial court also emphasized that Carruthers' ploy had become more apparent over the course of the proceedings.

With the very first set of attorneys I tried to give Mr. Carruthers the benefit of the doubt and excused them for reasons similar to yours, but a little bit different. With the second set of attorneys I tried to give Mr. Carruthers the benefit of the doubt and excuse them for reasons similar to yours, but a little bit different. Now that we're in the third set of attorneys , the ploy is much more apparent than it was with the first set of attorneys. Although, it was somewhat apparent to any of us who have been in these courts for many, many years as we all have been. Not wanting to jump to

-20-

any conclusions or not give him the benefit of the doubt, the first and second sets of attorneys were excused. <u>But now that we're into the third set of attorneys the ploy is much more apparent and, therefore, I'm much less receptive to these sorts of arguments than I was a year ago when the first set of attorneys came in wanting to be relieved.</u>

(Emphasis added.)

Finally, in response to counsel's comment that Carruthers should just go "pro se," the trial court concluded that it should refuse "to force a man to go pro se in a capital case if he doesn't want" and observed that Carruthers had never asserted his right of self-representation. Although Massey's motion to withdraw was denied, the trial judge granted his request for additional funds for further investigation and for hiring a mitigation specialist.

On January 2, 1996, six days before the trial was scheduled to begin, Massey renewed his motion to withdraw. Massey informed the trial court that he had continued to receive threatening letters at his home and was concerned for his daughter's safety because Carruthers had described the car she drove. Massey indicated that he cared more about Carruthers' right to a fair trial than did Carruthers himself, but given the recent and ongoing threats, Massey declared, "I don't want to represent this man. I can't represent him. I won't represent him."

At this hearing, the prosecution took the position that Massey should not be allowed to withdraw because the defendant was simply manipulating the system in an attempt to delay his trial. The State pointed out that the case had been pending for almost two years and each time a trial date drew near Carruthers would increase his letters and efforts to alienate his attorneys either through written or verbal personal attacks or threats. The State urged the trial court to deny the motion to withdraw and proceed to trial:

> [I]f a defendant, Your Honor, can threaten the system, if he can manipulate the system by threats, by letters, I'm not sure if that's what the makers of the constitution meant when they sat in Philadelphia and they said, look, let's let every defendant have a fair trial. Let's let him have a lawyer. Let's let a jury be over here. Let's let him have a judge; that's fair. Let's let no man be accused of a crime, will not go to trial, unless he receives a fair trial. Let no man be convicted–but the framers of the constitution, Your Honor, had not met Tony Carruthers.

After considering the comments of counsel, the trial judge briefly recounted the history of the case and again emphasized that, in his opinion, all of the attorneys appointed for the defendant, including Massey and Sayle, were excellent trial lawyers who had fully performed their duties with regard to Carruthers' defense, including filing all relevant motions and thoroughly pursing the investigation of the case. The trial court then ruled on Massey's motion to withdraw, stating as follows:

Now, this is the way that the case is going to proceed on Monday. Mr. Massey is still on the case. He still represents Mr. Carruthers. If between now and Monday Mr. Carruthers chooses to discuss with Mr. Massey the case and to cooperate with Mr. Massey in his preparation of the defense in this case, then I'll look to Mr. Massey to go forward in representing Mr. Carruthers. There have been disputes and conflicts between attorney and client before. This is not the first time that there has been a problem between attorney and client, and these types of problems can be repaired oftentimes. And differences can be patched up, and attorneys can go forward. And I would hope that that would be the case in this case. And I would hope that Mr. Carruthers would between now and Monday, work with Mr. Massey and Mr. Sayle in preparation for a trial. If Mr. Carruthers elects not to, however, he will go forward representing himself. This was raised on the 19th when Mr. Massey filed his motion to withdraw and we first heard it. At that time, I rejected the idea. I was reluctant to because I've never required an individual to go forward representing himself when he has not requested that. And I don't like that idea, but I've given a lot of thought to that suggestion since the 19th. For the record, Mr. Massey called me shortly after our hearing on the 19th when he received some letters in the mail from Mr. Carruthers that dealt further–that he felt further undermined his ability to represent him. And I just want that on the record so there is no misunderstanding about that. But since the 19th, and after the phone call from Mr. Massey that I received, after the hearing on the 19th, and after his request today, I've given it a lot of thought to what options were left, what options are still available in this case. And in my judgment, the only option that is still available if Mr. Carruthers chooses not to work with Mr. Massey and Mr. Sayle in going forward with this case next Monday, is for him to represent himself. And I'll provide him with a copy of the rules of Tennessee procedure, the rules of evidence. And he can sit at counsel table and voir dire the jury, and question witnesses, and give an opening statement, as any lawyer would, and he would be required to comply with all the rules as any lawyer would, if he chooses to go forward on his own. If he chooses to say nothing, then that's his prerogative, and – But that's what the situation will be next Monday, Mr. Carruthers. And the choice is yours. Again, the choice is yours. You have for the third time around an outstanding attorney representing you. And he's here, and he'll be available. If you choose to avail yourself of his services, he will represent you on Monday. If you choose not to, you can go forward representing yourself. If you go forward representing yourself, I will require Mr. Massey and Mr. Sayle to be available as elbow counsel so that at any recess or overnight, you can seek advice from them, and they can confer with you and advise you in any way that they deem appropriate. So if you elect not to have him represent you and you go forward representing yourself, they'll be in the courtroom observing, and they'll be available to offer advice and counsel to you at any recess, lunch break, overnight break. One of those two scenarios will occur next Monday. And again, it's up to Mr. Carruthers because we've been through this now for many, many months and at this point in time, the case needs to go forward. There is no other reason for the case to

be reset, no proof problems from one side or the other, no witness problems from one side or the other. The case is now set for the third time for trial. There is no extrinsic reason for an additional continuance. <u>And–so Mr. Carruthers is going to have to decide in which manner he wishes to proceed on Monday, but the case will go forward on Monday.</u> And I'll hear back from Mr. Massey Monday morning with regard to whether he has been able to confer with his client and what the progress of that has been, and whether he feels that the progress has been such that it would allow him to go forward in representing Mr. Carruthers.

(Emphasis added.)

The record reflects that at a hearing held the next day, January 3, 1996, Carruthers was "glaring" at Massey while "gritting his jaw."[21] Upon observing Carruthers' conduct, the trial court once again cautioned the defendant as follows:

<u>And again, as I did yesterday, I want to remind Mr. Carruthers that if it is his decision not to proceed with Mr. Massey and to proceed pro se–just a minute. I'll let you speak in a moment–then he needs to understand that he will be held to the same standard that attorneys are held to during a trial. Rules of evidence, rules of procedure will apply. And he will need to familiarize himself as best he can with those procedures and those rules between now and trial date because in proceeding pro se, he will certainly be held to that same standard.</u> Obviously, he realizes the charges that are pending and the potential for the imposition of the death penalty involved in this case. We've had numerous hearings and motions over the past fifteen or eighteen months, and all of those matters should be very apparent to Mr. Carruthers at this point in time.

Responding to the trial court's admonition, Carruthers said he did not want Massey representing him because Massey was on cocaine.

Following this hearing, Massey filed an application for extraordinary appeal[22] in the Court of Criminal Appeals challenging the trial court's ruling that he remain on the case either as counsel or as advisory counsel. In an order dated January 8, 1996, the Court of Criminal Appeals held that Massey should be allowed to immediately withdraw from further representation, stating:

This Court is of the opinion that the attorney-client relationship which may have previously existed, has deteriorated until such a relationship does not exist between Carruthers and Mr. Massey. Also the circumstances of this case make it

---

[21] The trial judge stated that "since [Carruthers] has been brought in the courtroom, he has in fact been glaring at Mr. Massey non-stop."

[22] See Tenn. R. App. P. 10.

impossible for Mr. Massey to ethically represent Mr. Carruthers. Carruthers has proclaimed that he will do bodily harm to Massey. He has in essence and in fact threatened Massey with death. Carruthers, who has a history of violent conduct, is apparently a member of a gang. All of his correspondence to Massey carries a drawing of a lidless eye that watches from the top of a pyramid. Moreover, Massey's family is filled with fear and anxiety due to the threats made to Massey; and Massey's secretary, who has had dealings with Carruthers by telephone, likewise has fear and anxiety based upon her conversations with Carruthers and the threats made against Massey. Given these circumstances, Mr. Massey had no alternative but to seek permission to withdraw as counsel. He is supported in this endeavor by the Disciplinary Counsel for the Tennessee Supreme Court Office, which advised Massey that he was ethically required to withdraw as counsel, and, if the motion was denied he was required to seek relief in the appellate courts.

* * * *

Given these facts and circumstances as well as the relevant provisions of the Code of Professional Conduct, which governs the conduct of lawyers in the State of Tennessee, Mr. Massey was entitled to be relieved as counsel of record for Mr. Carruthers. <u>If there ever was an amicable attorney-client relationship, it was eradicated by Mr. Carruthers' conduct in writing the letters aforementioned and threatening to do bodily harm to Mr. Massey the first time he saw him.</u> Today, Mr. Massey and Mr. Carruthers are at odds and their differences are irreconcilable. Furthermore, Mr. Massey, who emphatically denied any misconduct or addiction to drugs, must attempt to protect his family, secretary, and himself from physical harm as well as protect himself from further disciplinary complaints.[23]

(Emphasis added.)

The same day this order was filed, but before the trial judge had received the order, a hearing was held in the trial court. After learning that Massey had received seven more pieces of certified mail at his home since the hearing on January 2, and after being advised by Massey that the difficulties with Carruthers had not improved, the trial judge concluded that Carruthers,

through his actions, through his accusations, and letters, he has forced himself into a situation where I have no option but to require that he proceed pro se. And so in deference to your request, I will go forward with my previous statement and that is that you and Mr. Sayle will remain as elbow counsel. Mr. Carruthers will represent himself.

The trial court then reiterated, "[f]rom this point forward I'll give Mr. Carruthers the opportunity to speak on his own behalf at appropriate times. As I indicated to him last week, he will be expected

---

[23]The record reflects that Carruthers had filed a complaint against Massey with the Board of Professional Responsibility.

to comply with all of the rules of procedure and evidence that an attorney would be required to comply with."

Upon hearing the trial court's ruling, Carruthers claimed that he had attempted to reconcile with Massey and complained that he was not qualified to represent himself. The trial judge responded:

Well, those are the perils in going forward pro se. And in my judgment, Mr. Carruthers, as I've said on several occasions, and I don't intend to get back into a lengthy hearing on this issue at this time, but we've had two or three hearings already on this. In my judgment, and I understand you're stating now that you don't feel capable of going forward and representing yourself. But you need to understand that in my judgment you have created this problem for yourself. You are the author of your own predicament by, in my opinion, sabotaging the representation of you by four previous attorneys. These are now your fifth and sixth attorneys. In my judgment, because of actions that you've taken over the past 18 months, because of actions that you've taken, you are now in this situation. And so it may well be difficult for you to go forward in representing yourself, but this is the situation that you've created and you're going to have to do the best you can, because there is virtually no option left at this point. To reset it again, history would should would only – would be a futile effort, because at the eleventh hour with the seventh and eighth attorneys representing you, there would be some other effort, in my opinion, some other manipulation on your part that would then cause those attorneys to come in and want to get off your case. And then we'd reset it and appoint the ninth and tenth attorneys, and the eleventh and twelfth. And there'd be no end to it.

* * * *

And so we're going forward and you're going to represent yourself. I understand you're not an experienced attorney. I understand you may well have never gone through a voir dire process before. And that's unfortunate. I wish you had cooperated and gotten along with Mr. Nance a year and a half ago. He was an excellent attorney, has tried many, many cases in these courts, serious difficult cases and done an excellent job. I wish you had cooperated and gotten along with Coleman Garrett who, in my opinion, is one of the best trial attorneys in this entire state. He's tried many cases in this courtroom and defended individuals remarkably well. I wish you had cooperated and gotten along with Mr. Craig Morton and Mr. Glenn Wright, and Mr. Harry Sayle, and Mr. William Massey, because I think it would've been in your best interest to have done so. But it's been obvious that you have not. And so for that reason we're going forward.

* * * *

It's not easy to make this decision. It's not a decision that I made lightly or take lightly. But I tell you what, if the record isn't complete enough and replete

-25-

<u>enough with evidence of manipulative conduct and obstructionism, then I can't imagine ever there being a record for the appellate courts in Tennessee that would meet that criteria.</u>

(Emphasis added.)

After the trial court ruled, Carruthers offered to waive any conflict, to allow Massey to continue representing him, to apologize to Massey, and to testify that the accusations he had made against Massey were untrue. The trial court refused, finding that Carruthers was merely using another tactic to delay the proceeding.

The next day, January 9, 1996, the Court of Criminal Appeals entered an addendum to its previous order and allowed Massey to be completely relieved from further representation or participation in the case including providing assistance as "elbow counsel." However, Sayle continued on the case as elbow or standby counsel.

During voir dire two days later, January 11, 1996, the State requested a continuance of the trial due to the hospitalization of one of its material witnesses, Nakeita Shaw. The trial court granted the State's motion for a continuance and rescheduled the trial for April 15, 1996. At this point, in light of the continuance, Carruthers made an oral motion for appointment of new counsel.[24] The trial court denied the motion, stating:

> The ruling still stands. The system will not be held hostage by Tony Carruthers, and to go through another round of attorneys will be doing just that, because history suggests, as you've done in the past, that is if new attorneys were appointed and spent the time and investigated, the effort to get ready on this case, then at the eleventh hour something would happen, some allegations would be made that would undermine their ability to represent you, they'd ask to withdraw, we'd be back in the same situation that we were in with Mr. Larry Nance, with Mr. Coleman Garrett, with Mr. Bill Massey, all three of whom are outstanding criminal defense attorneys. All three of whom were fully capable of representing you, and all three of whom had to be relieved because of your actions. And in my judgment, enough is enough. And because of your actions, these attorneys are no longer representing you and, therefore, you will be representing yourself. You have ample time to prepare. You have access to legal opinion from Mr. Sayle. You have the file. You have the rules. You have a jury consultant. You have an investigator. And this is the manner in which we're going forward.

On January 16, 1996, the trial court approved Carruthers' request for funds to obtain an investigator to assist him and authorized the investigator to contact the trial court directly if

---

[24]One day earlier, when the State mentioned that it might possibly be requesting a continuance, Carruthers had adamantly objected to any continuance and stated he was ready to go to trial.

additional funds were needed. In February of 1996, Carruthers filed two more written motions for appointment of counsel which were again denied by the trial court for the same reasons set out above. In a hearing on February 20, 1996, the trial court considered Carruthers' pre-trial requests for funding for expert services, and, at this hearing, again recounted the events that culminated in Carruthers being required to represent himself. The trial court observed that "it will be apparent to anyone who objectively views this situation that Carruthers is not being denied the right to counsel."

Throughout these pre-trial proceedings, the trial court treated Carruthers with respect, patiently listened to his arguments and requests, and afforded Carruthers and his investigator considerable latitude in scheduling and arguing motions, even though most of these motions were similar or identical to motions that had already been filed and argued by counsel who had previously represented Carruthers. When Carruthers requested *ex parte* hearings to seek funding for experts, the prosecution would voluntarily leave the court room. The trial judge granted Carruthers' request for funding to obtain a forensic pathologist, but denied his request for funding for an accident reconstructionist.

In February of 1996, the trial court allowed Sayle to withdraw as elbow counsel because Carruthers apparently had no confidence or trust in Sayle and because Carruthers was launching personal, verbal attacks upon Sayle. When Sayle moved for permission to withdraw as elbow counsel, he stated:

> He has expressed the feeling that I am not working for him and that I have not done anything for him, I'm not going to do anything for him. He suspects – he's made it clear that he suspects that I'm working with the state in some capacity. And frankly none of the advice I give him is followed, and I don't think there is any intention of following it. And frankly its just – and the abuse gets extremely personal. Personal villification over the last couple of meetings, and I see no basis for being able to continue.

Thereafter, Carruthers twice made oral motions for appointment of counsel, first on March 4, 1996, and then on April 15, 1996, the day jury selection began. Again, the trial court denied these motions and noted that this was not the first case in which Carruthers had employed such tactics.[25] Carruthers therefore represented himself at trial and sentencing, participating in voir dire, presenting opening statement, questioning witnesses on cross-examination, making objections, presenting witnesses in his defense, and presenting closing argument. After the jury returned its verdicts as to guilt and sentencing, the trial court appointed counsel to represent Carruthers on his motion for new trial and on appeal.

In the Court of Criminal Appeals, Carruthers, by and through counsel, first asserted that he had been denied due process when the trial court required him to represent himself at trial and sentencing in this capital case. The Court of Criminal Appeals rejected his claim and held that,

---

[25]In an earlier aggravated assault case Carruthers had been appointed four attorneys before the case was finally tried. See Carruthers v. State, No. 02C01-9505-CR-00130 (Tenn. Crim. App., Jackson, April 17, 1996).

under the circumstances of this case, the trial court was justified in requiring Carruthers to represent himself, reasoning as follows:

> We do not take lightly the result that a defendant has to proceed pro se in any trial, especially one involving a capital offense. Our judicial system could not survive if those accused of crimes were literally run over "roughshod." But while the individual must be protected by the system, the judicial system must also be protected from abuses by an individual. A person charged with criminal acts cannot be allowed to subvert the judicial system.

In this Court, counsel for Carruthers again contend that he was denied his right to due process when he was required to represent himself during the trial of this capital case. Counsel assert that Carruthers did not expressly waive his right to counsel, that any implicit waiver was invalid because the trial court did not advise Carruthers of the possibility of waiver or the dangers of self-representation, and that his conduct is not egregious enough to justify a finding of forfeiture. In response, the State argues that the Court of Criminal Appeals correctly found that Carruthers forfeited his right to counsel because Carruthers was using this right in order to manipulate the judicial system and delay the trial. In the alternative, the State argues that the record in this appeal supports a finding that Carruthers implicitly waived his right to counsel by his course of conduct and that the trial court's warnings to Carruthers were sufficient to inform him that he would be deemed to have waived his right to counsel if his conduct continued and of the dangers of self-representation.

Both the United States and Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of appointed counsel at trial. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9; Martinez v. Court of Appeal of California, __ U.S. __, 120 S. Ct. 684, 686, 145 L.Ed.2d 597 (2000); Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L.Ed.2d 799 (1963); State v. Small, 988 S.W.2d 671, 673 (Tenn. 1999); State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984); see also Tenn. R. Crim. P. 44(a). The right of an accused to assistance of counsel, however, does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel. See Morris v. Slappy, 461 U. S. 1, 13-14, 103 S. Ct. 1610, 1617-18, 75 L.Ed.2d 610 (1983); United States v. Gallop, 838 F.2d 105, 107 (4th Cir. 1988); Siers v. Ryan, 773 F.2d 37, 44 (3d Cir. 1985); State v. Moody, 968 P.2d 578, 579 (Ariz. 1998); Snell v. State, 723 So.2d 105, 107 (Ala. Crim. App. 1998); Jones v. State, 449 So.2d 253, 258 (Fla. 1984); State v. Ryan, 444 N.W.2d 610, 625 (Neb. 1989). The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant. See Wheat v. United States, 486 U.S. 153, 159, 108 S. Ct. 1692, 1697. 100 L.Ed.2d 140 (1988).

Ordinarily, waiver of the right to counsel must be voluntary, knowing, and intelligent. See Johnson v. Zerbst, 304 U.S. 458, 464-65, 58 S. Ct. 1019, 1023, 82 L.Ed. 1461, 1466-67 (1938); Small, 988 S.W.2d at 673. Typically, such a waiver occurs only after the trial judge advises a defendant of the dangers and disadvantages of self-representation and determines that the defendant "knows what he is doing and his choice is made with eyes open." Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S. Ct. 236, 242, 87 L.Ed. 268 (1942); see also Small, 988 S.W.2d

at 673; <u>Northington</u>, 667 S.W.2d at 61-62. Many courts, however, have recognized that the right to counsel is not a license to abuse the dignity of the court or to frustrate orderly proceedings.[26] Accordingly, several courts have acknowledged that, like other constitutional rights,[27] the right to counsel can be implicitly waived or forfeited if a defendant manipulates, abuses, or utilizes the right to delay or disrupt a trial. <u>See</u> <u>United States v. Leggett</u>, 162 F.3d 237, 249 (3rd Cir. 1998) (holding that defendant forfeited his right to counsel when he physically assaulted his attorney); <u>United States v. Goldberg</u>, 67 F.3d 1092, 1097-1101 (3rd Cir. 1995) (discussing the principles of implicit waiver by conduct and forfeiture, but concluding that defendant had not forfeited his right to counsel); <u>United States v. McLeod</u>, 53 F.3d 322, 326 (11th Cir. 1995) (holding that defendant forfeited his right to counsel by exhibiting abusive, threatening, and coercive conduct toward his attorney); <u>United States v. Fazzini</u>, 871 F.2d 635, 642 (7th Cir. 1989) (holding that defendant waived his right to counsel where, after being warned that he could lose the right if he failed to cooperate, defendant continued to refuse to cooperate with numerous court-appointed lawyers); <u>United States v. Kelms</u>, 827 F.2d 1319, 1322 (9th Cir. 1987) (holding that defendant implicitly waived the right to counsel where, to delay the trial, defendant refused to accept appointed counsel or hire his own attorney); <u>United States v. Mitchell</u>, 777 F.2d 248, 256-57 (5th Cir. 1985) (holding defendant waived his right to counsel when, in bad faith and for purpose of delay, he retained counsel known to have a conflict of interest and failed to retain other counsel); <u>Richardson v. Lucas</u>, 741 F.2d 753, 756 (5th Cir. 1984) (holding that defendant's refusal to allow any public defender, regardless of competence, to represent him constituted a waiver of the right to counsel); <u>United States v. Moore</u>, 706 F.2d 538, 540 (5th Cir. 1983) (holding that defendant's "persistent, unreasonable demand for dismissal of counsel and appointment of new counsel . . . is the functional equivalent of a knowing and voluntary waiver of counsel"); <u>United States v. Leavitt</u>, 608 F.2d 1290, 1292 (9th Cir. 1979); <u>United States v.</u>

_____

[26]<u>See</u> <u>United States v. Flewitt</u>, 874 F.2d 669, 674 (9th Cir. 1989) ("The right to self-representation is not a license to abuse the dignity of the courtroom."); <u>Berry v. Lockhart</u>, 873 F.2d 1168, 1171 (8th Cir. 1989) ("A defendant has no right to manipulate his right to counsel in order to delay or disrupt the trial."); <u>Gallop</u>, 838 F.2d at 108 ("[R]ight [to counsel] must not obstruct orderly judicial procedure and deprive courts of the exercise of their inherent power to control the administration of justice."); <u>United States v. White</u>, 529 F.2d 1390, 1393 (8th Cir. 1976) ("Of course, the right to counsel is a shield, not a sword. A defendant has no right to manipulate his right for the purpose of delaying and disrupting the trial."); <u>Brooks v. State</u>, 819 S.W.2d 288, 290 (Ark. Ct. App. 1991) ("[T]he constitutional right to counsel is a shield, not a sword, and . . . a defendant may not manipulate this right for the purpose of delaying the trial or playing 'cat-and-mouse' with the court."); <u>Jones</u>, 449 So.2d at 258 ("We consider it implicit . . . that the right to appointed counsel, like the obverse right to self-representation, is not a license to abuse the dignity of the court or to frustrate orderly proceedings. . . ."); <u>State v. Green</u>, 471 N.W.2d 402, 407 (Neb. 1991) ("A defendant may not utilize his or her right to counsel to manipulate or obstruct the orderly procedure in the court or to interfere with the fair administration of justice."); <u>State v. Montgomery</u>, 530 S.E.2d 66, 69 (N.C. Ct. App. 2000) ("[A]n accused may lose his constitutional right to be represented by counsel of his choice when he perverts that right to a weapon for the purpose of obstructing and delaying his trial."); <u>Painter v. State</u>, 762 P.2d 990, 992 (Okla. Ct. Crim. App. 1992) ("The right to assistance of counsel may not be put to service as a means of delaying or trifling with the court."); <u>United States v. Fowler</u>, 605 F.2d 181, 183 (5th Cir. 1979) ("The right to assistance of counsel, cherished and fundamental though it be, may not be put to service as a means of delaying or trifling with the court."); Cf. <u>Faretta v. California</u>, 422 U.S. 806, 834 n.46, 95 S. Ct. 2525, 2541 n.46, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license to abuse the dignity of the courtroom.").

[27]<u>See, e.g.</u> <u>Illinois v. Allen</u>, 397 U.S. 337, 90 S. Ct. 1057, 25 L.Ed.2d 353 (1970) (holding that by persisting in disruptive conduct the accused lost his constitutional right to be present throughout the trial).

Travers, 996 F. Supp. 6, 17 (S.D. Fla. 1998) (finding forfeiture as a result of the defendant's "persistently abusive, threatening and coercive" dealings with his attorney and noting that the defendant had been repeatedly warned that his failure to cooperate could result in a finding of forfeiture); United States v. Jennings, 855 F. Supp. 1427, 1442 (M.D. Pa. 1994) (finding that defendant waived his right to counsel when he physically assaulted his attorney); Siniard v. State, 491 So.2d 1062, 1063-64 (Ala. Ct. Crim. App. 1986) (holding that defendant forfeited the right to counsel where he was allowed eight months and several continuances to retain counsel but failed to do so); Brooks, 819 S.W.2d at 290 (recognizing forfeiture, but concluding that forfeiture was not appropriate because the record did not show that the defendant used his right to manipulate the judicial system); Potter v. State, 547 A.2d 595, 602 (Del. 1988) (stating that a defendant's dilatory actions in retaining counsel can justify a forfeiture of the right to counsel); Jones, 449 So.2d at 256 (holding that defendant waived his right to counsel by persistently demanding counsel of his choice and refusing to cooperate with appointed counsel); Brickert v. State, 673 N.E.2d 493, 496 (Ind. Ct. App. 1997) (holding that defendant waived his right to counsel by engaging in conduct designed to frustrate the judicial process and avoid or delay a trial); People v. Sloane, 693 N.Y.S.2d 52, 53 (N.Y. App. Div. 1999) (holding that defendant forfeited his right to counsel by his "persistent pattern of threatening, abusive, obstreperous, and uncooperative" behavior towards four successive appointed attorneys); People v. Gilchrist, 658 N.Y.S.2d 269 (N.Y. App. Div. 1997) (holding that defendant forfeited his right to counsel when he assaulted his fourth appointed attorney); Montgomery, 530 S.E.2d at 69 (holding that defendant forfeited his right to counsel when, over the course of fifteen months, he was twice appointed counsel and twice released his appointed counsel); Painter, 762 P.2d at 992 (holding that defendant waived his right to counsel when he failed to secure counsel or request appointed counsel so that he could delay his hearing); State v. Boykin, 478 S.E.2d 689, 690 (S.C. Ct. App. 1996) (recognizing that a defendant may implicitly waive the right to counsel by misconduct, but finding no implicit waiver because no warnings had been given the defendant); City of Tacoma v. Bishop, 920 P.2d 214, 218 (Wash. Ct. App. 1996) (recognizing forfeiture but concluding that the defendant's misconduct was not sufficiently egregious to support a finding of forfeiture); State v. Cummings, 546 N.W.2d 406, 418 (Wis. 1996) (holding that defendant had forfeited his right to counsel where he consistently refused to cooperate and constantly complained about counsel's performance to manipulate, disrupt, and delay the proceedings); see generally Wayne R. LaFave, et al., Criminal Procedure, § 11.3(c) (2nd ed. 1999) ("What these courts have held, in effect, is that the state's interest in maintaining an orderly trial schedule and the defendant's negligence, indifference, or possibly purposeful delaying tactic, combined to justify a forfeiture of defendant's right to counsel . . . .").

Some courts have attempted to distinguish the concepts of implicit waiver and forfeiture. See, e.g., Goldberg, 67 F.3d at 1099-1100; City of Tacoma, 920 P.2d at 218. These courts hold that an implicit waiver occurs when, after being warned by the court that counsel will be lost if dilatory, abusive, or uncooperative misconduct continues, a defendant persists in such behavior. Id. In contrast, forfeiture results regardless of the defendant's intent to relinquish the right and irrespective of the defendant's knowledge of the right. Id. Accordingly, where a defendant engages in extremely serious misconduct, a finding of forfeiture is appropriate even though the defendant was not warned

of the potential consequences of his or her actions or the risks associated with self-representation. See Goldberg, 67 F.3d at 1102; City of Tacoma, 920 P.2d at 218.

However, many courts considering this issue do not distinguish between the two concepts and have used the terms implicit waiver and forfeiture interchangeably. See Goldberg, 67 F.3d at 1098; Cf. Freytag v. Commissioner of Internal Revenue Service, 501 U.S. 868, 895 n.2, 111 S. Ct. 2641, 2647 n.2, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring in part and concurring in judgment) ("The Court uses the term 'waive' instead of 'forfeit.' The two are really not the same, although our cases have so often used them interchangeably that it may be too late to introduce precision. Waiver, the intentional relinquishment or abandonment of a known right or privilege, is merely one means by which a forfeiture may occur. Some rights may be forfeited by means short of waiver.") (internal citations and quotations omitted).

Although this Court has never considered the precise question presented in this appeal, when discussing a non-indigent defendant who fired his attorney in open court and thereafter repeatedly protested about going to trial without a lawyer, we recognized that even "[t]hough a defendant has a right to select his own counsel if he acts expeditiously to do so . . . he may not use this right to play a 'cat and mouse' game with the court . . . ." State v. Chadwick, 224 Tenn. 75, 79, 450 S.W.2d 568, 570 (1970); see also Glasgow v. State, 224 Tenn. 626, 461 S.W.2d 24 (1970); State v. Dubrock, 649 S.W.2d 602 (Tenn. Crim. App. 1983) (holding that non-indigent defendants waived the right to counsel because they refused to hire an attorney). The idea that the right to counsel may not be used to manipulate or toy with the judicial system applies equally to indigent and non-indigent defendants. Although an indigent criminal defendant has a constitutional right to appointed counsel, that right may not be used as a license to manipulate, delay, or disrupt a trial. See footnote 26 supra, citing cases. Accordingly, we conclude that an indigent criminal defendant may implicitly waive or forfeit the right to counsel by utilizing that right to manipulate, delay, or disrupt trial proceedings. We also hold that the distinction between these two concepts is slight and that the record in this case supports a finding of both implicit waiver and forfeiture.

When Garrett and Morton were allowed to withdraw and Massey and Sayle were appointed, the trial court advised Carruthers that Massey and Sayle would be the lawyers representing him at trial and that there would be no further withdrawal and new appointments absent a "gigantic conflict." Despite this admonishment, Carruthers once again launched personal attacks and threats against Massey, threats that eventually extended to Massey's office staff and family members. When Massey renewed his motion to withdraw on January 2, 1996, the trial court specifically and clearly advised Carruthers that he had two choices – cooperate with Massey or represent himself. Carruthers also was advised that if he chose not to cooperate with Massey and to represent himself, he would be required to comply with all procedural rules as if he were an attorney. The trial court repeated his admonishment at a hearing on January 3, 1996. Despite the trial court's clear warnings, quoted fully earlier in this opinion, Carruthers persisted with his attitude of hostility toward Massey, as is evidenced both by his "glaring" at Massey during the hearings and by the letters Massey received after those hearings. In our view, Carruthers implicitly waived his right to counsel, because, after

being warned by the trial court that he would lose his attorney if his misconduct continued, Carruthers persisted in his misconduct.

In so holding, we reject Carruthers' claim that the warnings given him by the trial court were not sufficient to support a finding of implied waiver. The cases upon which Carruthers relies in support of this claim are inapposite because they involve explicit, voluntary waiver cases. See United States v. McDowell, 814 F.2d 245, 251-52 (6th Cir. 1987); Crandell v. Bunnell, 25 F.3d 754 (9th Cir. 1994); United States v. Silkwood, 893 F.2d 245, 248-49 (10th Cir. 1989). We decline to hold that a trial court must provide extensive and detailed warnings when a defendant's conduct illustrates that he or she understands the right to counsel and is able to use it to manipulate the system. We conclude that an implicit waiver may appropriately be found, where, as here, the record reflects that the trial court advises the defendant the right to counsel will be lost if the misconduct persists and generally explains the risks associated with self-representation. Cf. Kelm, 827 F.2d at 1322 (considering the record as a whole when determining the sufficiency of the trial court's advisements).

Even assuming the warnings given Carruthers were insufficient to support a finding of implicit waiver, however, we conclude that Carruthers' conduct was sufficiently egregious to support a finding that he forfeited his right to counsel. The circumstances culminating in the trial court's ruling have been fully summarized. Carruthers repeatedly and unreasonably demanded that his appointed counsel withdraw and that new counsel be appointed. Carruthers' demands escalated as his scheduled trial dates drew near. As the trial court recognized, the "ploy" to delay the trial became increasingly apparent with each new set of attorneys. In addition, Carruthers' conduct degenerated and his outrageous allegations and threats escalated markedly with each new set of attorneys. As the trial court emphasized, Carruthers was the author of his own predicament and sabotaged his relationship with each successive attorney with the obvious goal of delaying and disrupting the orderly trial of the case. Under these circumstances, the trial court was fully justified in concluding that Carruthers had forfeited his right to counsel. Indeed, in situations such as this one, a trial court has no other choice but to find that a defendant has forfeited the right to counsel; otherwise, an intelligent defendant "could theoretically go through tens of court-appointed attorneys and delay his trial for years." Cummings, 546 N.W.2d at 419.

As did the trial court and the Court of Criminal Appeals, we have carefully considered the ramifications of holding that an indigent criminal defendant in a capital case has implicitly waived and forfeited his valuable right to counsel.[28] We are aware that both implicit waiver and forfeiture are extreme sanctions. However, Carruthers' conduct was extreme and egregious. The sanction is appropriate under the circumstances and commensurate with Carruthers' misconduct. We reiterate that a finding of forfeiture is appropriate only where a defendant egregiously manipulates the

---

[28]As the Court of Criminal Appeals noted, this appears to be the only capital case in the country in which a defendant has been held to have implicitly waived or forfeited the right to counsel and has been required to represent himself at trial and sentencing. Cf. Waterhouse v. State, 596 So.2d 1008, 1011-15 (Fla. 1992) (requiring the capital defendant to make a pro se argument at his capital re-sentencing hearing).

constitutional right to counsel so as to delay, disrupt, or prevent the orderly administration of justice. Where the record demonstrates such egregious manipulation a finding of forfeiture should be made and such a finding will be sustained, even if the defendant is charged with a capital offense. Persons charged with capital offenses should not be afforded greater latitude to manipulate and misuse valuable and treasured constitutional rights.

Carruthers also claims that he was denied due process because he was forced to choose between incompetent counsel and no counsel at all, and he asserts that the trial judge should have held a hearing to determine the validity of his complaints about his attorneys.

We disagree. There is simply no evidence indicating that any one of the many attorneys appointed to represent Carruthers was ineffective.[29] In fact, the record fully supports the trial court's repeated findings that the attorneys were qualified, competent, and highly skilled trial lawyers. The record demonstrates that the trial court closely supervised the case, inquired about defense counsel's progress, allowed Carruthers to voice his concerns about counsel, and conscientiously reviewed and considered letters from Carruthers containing allegations about his attorneys. Based upon this information, the trial court repeatedly found the attorneys representing Carruthers to be competent. Most of Carruthers' complaints about his attorneys were outrageous personal attacks that had little or nothing to do with legal representation. Indeed, these allegations were so outrageous that the letters were sealed at trial and remain a sealed exhibit to the record on appeal. Although we have reviewed the letters, it is not necessary to reveal the specific nature of the offensive and unfounded allegations.[30] Suffice it to say that, given the nature of the allegations and the trial court's close and careful supervision of the case, a formal hearing to determine counsel's competency was not necessary.

To the extent that Carruthers is alleging that his pro se representation was ineffective, we agree with the Court of Criminal Appeals' conclusion that when a defendant forfeits or waives the right to counsel, regardless of whether the waiver is explicit or implicit, he or she also forfeits or waives the right to effective assistance of counsel. See Small, 988 S.W.2d at 673; State v. Goodwin, 909 S.W.2d 35, 45 (Tenn. Crim. App. 1995); Cf. Faretta, 422 U.S. at 835 n.46, 95 S. Ct. at 2541 n.46("[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent

---

[29] Our holding that this record does not support Carruthers' claim that he was forced to choose between ineffective counsel or no counsel at all does not preclude Carruthers from asserting ineffective assistance of counsel in a petition for post conviction relief. We have considered Carruthers' assertion of ineffective counsel in this appeal as a forfeiture argument, and we emphasize that claims of ineffective assistance of counsel generally are more appropriately raised in a petition for post conviction relief. See State v. Anderson, 835 S.W.2d 600, 606 (Tenn. Crim. App. 1992) ("Raising issues pertaining to the ineffective assistance of counsel for the first time in the appellate court is a practice fraught with peril."); cf. State v. Wilson, __ S.W.3d __ (Tenn. 2000) (holding that a constitutional challenge to the validity of a guilty plea should be raised and litigated in a petition for post-conviction relief rather than on direct appeal).

[30] As previously stated, after the trial court ruled that Carruthers had forfeited his right to counsel, Carruthers offered to testify that the allegations he made about Massey were untrue.

himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel.").[31]

Carruthers also argues that his right to counsel was violated when the trial court allowed Sayle to withdraw as advisory counsel. We disagree. This Court recently held that "there is no constitutional right to the appointment of advisory counsel where a defendant has knowingly and intelligently waived the right to counsel." Small, 988 S.W.2d at 675. We also recognized in Small that trial courts have discretion to appoint advisory counsel, but emphasized that trial court decisions regarding appointment of advisory counsel will not be overturned on appeal absent a showing of abuse of discretion. Id. Carruthers has cited no authority that would require adoption of a different rule in this case.

After finding that Carruthers had implicitly waived or forfeited his right to appointed counsel, the trial court, consistent with preferred practice,[32] appointed advisory counsel. Sayle was allowed to withdraw because Carruthers leveled personal attacks against him. Given Carruthers' relationship with his five prior court-appointed attorneys, we conclude that the trial court did not abuse its discretion by permitting Sayle to withdraw. Indeed, the trial court's decision was entirely reasonable. Cf. Cummings, 546 N.W.2d at 419 (upholding the trial court's refusal to appoint standby counsel because the defendant had totally refused to cooperate with his previous court-appointed counsel). This issue is without merit.

Finally, Carruthers argues that the trial court did not treat him fairly because he was forced to represent himself. Carruthers recites an extensive list of over thirty episodes allegedly supporting his allegations that his trial was unfair and his treatment unequal. As the Court of Criminal Appeals found, most of the restrictions about which Carruthers complains resulted from his status as a pro se litigant and a prisoner subject to strict security measures. In fact, the record reflects that the trial court was much more lenient with Carruthers than with the other defense attorneys and went to great lengths to accommodate Carruthers' requests, even issuing subpoenas for witnesses during trial. The trial court also liberally approved funds for Carruthers to secure expert and investigative assistance. The trial court was not required to exempt Carruthers from complying with the rules of evidence and procedure or to allow Carruthers free reign in the courtroom. The record reveals that Carruthers was treated fairly by the trial court, and this issue is without merit.

---

[31] We note, however, that a defendant retains the right to complain of ineffective assistance with respect to any stage of the proceeding wherein he or she was represented by counsel. Cf. Daughtry v. State, 482 S.E.2d 532, 533 (Ga. Ct. App. 1997) (stating that a criminal defendant will not be heard to assert a claim of ineffective assistance of counsel with respect to any of the stages of the proceedings wherein he was counsel). Therefore, as previously stated, our holding in this appeal does not preclude Carruthers from alleging in a post conviction petition ineffective assistance of counsel with respect to a stage of the proceeding wherein he was represented by counsel.

[32] Moore, 706 F.2d at 540.

**Denial of Montgomery's Motion for Severance**

Montgomery claims that the trial court erred by refusing to sever his case from that of Carruthers under Tenn. R. Crim. P. 14(c)(2).[33] Montgomery asked for a severance, before trial, during trial, and once again in his motion for new trial, arguing that the trial court's failure to grant a severance resulted in prejudicial error mandating a new trial.[34] In this Court, Montgomery claims he was unduly prejudiced by a joint trial because of the admission of certain statements made by Carruthers that would not have been admissible at a separate trial and because of the "grossly prejudicial fashion" in which Carruthers represented himself at trial. The State responds that the trial court appropriately denied Montgomery's requests for a severance and alternatively contends that any possible error in denying the request was harmless.

Whether a severance should be granted is a matter entrusted to the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion unless it results in clear prejudice to the defendant. See State v. Hutchison, 898 S.W.2d 161, 166 (Tenn. 1994); State v. Coleman, 619 S.W.2d 112, 116 (Tenn.1981); Hunter v. State, 222 Tenn. 672, 681, 440 S.W.2d 1, 6 (1969); State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988). In Woodruff v. State, 164 Tenn. 530, 538-39, 51 S.W.2d 843, 845 (1932), this Court noted that:

> The state, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, <u>unless to do so would unfairly prejudice the rights of the defendants.</u>

(Emphasis added.) Reversal is required only when the record demonstrates that "the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." Hunter, 222 Tenn. at 682, 440 S.W.2d at 6; see also Burton, 751 S.W.2d at 447.

No Tennessee court has previously considered the effect of one defendant's self-representation on a co-defendant's right to a severance. Several federal courts have held that, while "pregnant with the possibility of prejudice," a trial involving a pro se defendant and a represented

---

[33]Subsection (c)(1) provides for severance where a co-defendant's out-of-court statement refers to the defendant but is not admissible against the defendant. Subsection (c)(2) provides in relevant part that:

> [t]he court, on motion of the state or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if: (i) [b]efore trial . . . it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants; or (ii) [d]uring trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

[34]Montgomery first requested a severance on December 16, 1994, again on February 16, 1996, when it appeared Carruthers might be required to proceed pro se, on April 19, 1996 during the course of trial as a result of Carruthers' pro se representation, and again on April 24, 1996, immediately before Carruthers called Alfredo Shaw to testify as a witness, when it became clear in a jury-out hearing that Alfredo Shaw would testify consistently with his grand jury testimony and implicate Carruthers in the killings.

co-defendant is not prejudicial per se. United States v. Veteto, 701 F.2d 136, 138-39 (11th Cir. 1983); see also Person v. Miller, 854 F.2d 656, 665 (4th Cir. 1988); United States v. Oglesby, 764 F.2d 1273, 1275-76 (7th Cir. 1985); United States v. Sacco, 563 F.2d 552, 555-56 (2nd Cir. 1977); State v. Canedo-Astorga, 903 P.2d 500, 504 (Wash. Ct. App. 1995). Rather than automatically granting a severance in such cases, these courts have suggested that certain precautionary measures be employed to minimize the possibility of prejudice, including

> appointing standby counsel, warning the pro se defendant that he will be held to the rules of law and evidence and that he should refrain from speaking in the first person in his comments on the evidence, and instructing the jury prior to the closing remarks, during summation and in final instructions, that nothing the lawyer said is evidence in this case. [T]he district judge should also make clear to the jury at the outset that anything the pro se defendant says in his 'lawyer role' is not evidence and should instruct the pro se defendant beforehand that he should both avoid reference to co-defendants in any opening statement or summation without prior permission of the court and refrain from commenting on matters not in evidence or solely within his personal knowledge or belief.

Veteto, 701 F.2d at 138-39; Oglesby, 764 F.2d at 1275; Sacco, 563 F.2d at 556-57; Canedo-Astorga, 903 P.2d at 506. These courts have emphasized that such precautionary measures are "suggestions, not requirements, for preventing the possibility of prejudice from ripening into actuality" in a trial involving a pro se defendant and a represented co-defendant. Veteto, 701 F.2d at 138. We agree that these precautionary measures should be employed when a pro se defendant and a represented co-defendant are tried jointly. However, in rare cases, such as this one, even these protective measures will not be sufficient to prevent "the possibility of prejudice from ripening into actuality." Id.

Although the trial court required Carruthers to generally adhere to the rules of evidence and procedure and cautioned him about making statements to the jury, these measures were not enough to prevent his pro se representation from prejudicing Montgomery's right to a fair trial. Indeed, despite the trial court's efforts, the record demonstrates that Montgomery was severely prejudiced by Carruthers' self-representation, specifically, his offensive mannerisms before the jury,[35] his questioning of witnesses that elicited incriminating evidence,[36] and most importantly, his calling

---

[35] The jury sent notes to the trial judge complaining about Carruthers "scratching or pulling around his groin when standing facing the jury. We find this very offensive," and later asking the trial judge why Carruthers "was constantly asking the same question over and over."

[36] For example, during cross-examination Carruthers asked Terrell Adair if he knew who had shot him and why he had been shot. Adair responded, "they say you did it." Again during cross-examination, Carruthers asked Andre Johnson, "Did you tell me that Reginald Burkes told you that somebody was trying to get you?" Johnson responded, "Yes sir. And I told you it was you, sir."

Alfredo Shaw to testify as a witness. The prejudice to Montgomery was compounded when the State used and emphasized the incriminating evidence elicited by Carruthers during its closing argument.[37]

We do not agree with the State's assertion that any error is harmless because the trial court instructed the jury "that if evidence applied to one defendant they should only apply it to the one defendant." As Montgomery points out, despite this general instruction, at no point did the trial court instruct the jury that any particular evidence applied only to one defendant and not the other. Even though Montgomery's name was not mentioned, Alfredo Shaw's testimony clearly indicated that others were involved with Carruthers in committing these crimes, and given the joint trial, the jury likely inferred that Montgomery was one of the others.[38]

We recognize that the prejudice resulting to Montgomery from being tried jointly with Carruthers did not become fully apparent until the trial had concluded. Only at the conclusion of the trial was it possible for the trial court to comprehend the full effect of Carruthers' self-representation upon Montgomery's right to a fair trial. We realize that the trial court properly attempted to accommodate the interest of judicial economy, the State's interest in having guilt determined and punishment assessed in a single trial, and the defendants' right to a fair trial. However, by the time this issue was raised in the motion for new trial, we believe that the record demonstrated that Montgomery "was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." Hunter, 222 Tenn. at 682, 440 S.W.2d at 6; see also Burton, 751 S.W.2d at 447. We therefore hold that Montgomery's right to a fair trial was prejudiced when he was denied a severance and was jointly tried with Carruthers.[39] Accordingly, we reverse Montgomery's convictions and sentences and remand for a new trial.[40]

---

[37]For example, in its closing argument, the State reminded the jury that Carruthers had put on a seminar about drug dealing in Shelby County, highlighted Carruthers' cross-examination that elicited incriminating evidence, and emphasized that Carruthers had put on proof through Alfredo Shaw to show "what happened between 11:00 [p.m.] and 5:00 [a.m.]" the day the killings occurred.

[38]Carruthers generically referred to others when describing the events to Alfredo Shaw. For example, Shaw testified that "Tony told me they went to Marcellos' mother's house, Delois, and told her - - asked her where the money was." Again, Shaw testified that "they burned up the truck, burned Marcellos' truck up, to cover up the fingerprints up that was inside the truck. Tony Carruthers then stated that they drove the bodies back to Memphis. Marcellos and Tucker were I'm assuming dead."

[39]Even though we have concluded that a severance should have been granted, we do not agree with Montgomery's assertions that much of the evidence admitted in the joint trial will be inadmissible in a separate trial. As more fully explained in the next section, hearsay statements are admissible under the co-conspirator exception even if the conspirators are separately tried, and where a conspiracy exists, even if Montgomery was not yet a member, he is deemed to have adopted the previous acts and declarations of his fellow conspirators. See Owens v. State, 84 Tenn. 1, 4 (1885) ("And everyone entering into a conspiracy is a party to every act which has before been done by the others, and to every act by the others afterward, in furtherance of the common design."); see also United States v. Brown, 943 F.2d 1246, 1255 (10th Cir. 1991); 23 C.J.S.2d Criminal Law § 982 (1989).

[40]Because Montgomery's convictions are being reversed and his case remanded for a new trial, we need not
(continued...)

**Admissibility of Jonathan Montgomery's Statements**

Carruthers next complains that the trial court erred in allowing the State's witness Chris Hines to testify about the statements of Jonathan Montgomery. According to Carruthers, Hines' testimony about Jonathan's statements was inadmissible hearsay. The State argues that Hines' testimony was admissible under the co-conspirator hearsay exception. <u>See</u> Tenn. R. Evid. 803(1.2)(E).

Specifically, Carruthers complains about Hines' testimony relating the statements Jonathan made to him about these murders when Jonathan borrowed Hines' car the night of the murders and when Jonathan and Hines were at the carwash the morning after the murders. The Court of Criminal Appeals held that Jonathan's first statement to Hines fell within the co-conspirator exception because at the time Jonathan asked Hines to take him to the cemetery, one could infer that the victims had not been buried and Jonathan was needed to complete the robbery, kidnappings, and murders. The Court of Criminal Appeals also held that Jonathan Montgomery's statements to Hines the next morning while Hines' car was being washed were not in furtherance of the conspiracy but were more akin to "casual conversation" about past events and thus inadmissible. Since the second inadmissible statement was cumulative of the first admissible statement, the Court of Criminal Appeals found the error harmless. We agree.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible in evidence except as provided by exceptions in the Tennessee Rules of Evidence or other applicable law. <u>See</u> Tenn. R. Evid. 802. One of the exceptions to the hearsay rule is a statement of a co-conspirator. <u>See</u> Tenn. R. Evid. 803(1.2)(E). Under this exception, hearsay is admissible if it constitutes "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." <u>Id.</u>

A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means. <u>See</u> <u>State v. Alley</u>, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997); <u>State v. Gaylor</u>, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); <u>State v. Houston</u>, 688 S.W.2d 838, 841 (Tenn. Crim. App. 1984); <u>State v. Lequire</u>, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981). To be admissible under the co-conspirator hearsay exception, a statement must be made "during the course of" a conspiracy. This means that the conspiracy must have been occurring or ongoing at the time the statement was made. <u>See</u> <u>State v. Walker</u>, 910 S.W.2d 381, 385

[40](...continued)
address all his claims relating to erroneous admission and improper use of evidence because it is not likely these same alleged errors will reoccur. However, we emphasize that prior inconsistent statements of Nakeita Shaw, or any other witness, ordinarily are admissible only for purposes of impeachment and, unless the statement satisfies another hearsay exception, should not be admitted to prove the truth of the matter asserted. An instruction to the jury so limiting its consideration of any prior inconsistent statement ordinarily is appropriate. If the defense fails to object to admission of a prior inconsistent statement or fails to request a limiting instruction, the trial court should consider whether a *sua sponte* instruction is warranted to foreclose a reversal on appeal for plain error. <u>See</u> <u>State v. Smith</u>, 24 S.W.3d 274, 280 (Tenn. 2000).

(Tenn. 1995); Gaylor, 862 S.W.2d at 554; Neil Cohen et al., Tennessee Law of Evidence § 803(1.2)(6) (3d ed. 1995). If the conspiracy had not begun or had already concluded when the statement was made, the statement will not be admissible under the co-conspirator exception. Id. The exception also requires that the statement be "in furtherance of" the conspiracy. In short, the statement must be one that will advance or aid the conspiracy in some way. See State v. Heflin, 15 S.W.3d 519, 523 (Tenn. Crim. App. 1999). This has long been the law in Tennessee. See Owens, 84 Tenn. at 4; Harrison v. Wisdom, 54 Tenn. 99, 107-08 (1872). Commentators have explained that:

> [a] statement may be in furtherance of the conspiracy in countless ways. Examples include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project. While such statements are ordinarily made to other conspirators, Rule 803(1.2)(E) does not so require. Statements to third parties may qualify if in furtherance of the conspiracy.

Tennessee Law of Evidence, § 803(1.2). 6, p. 522. Where a conspiracy exists, "everyone entering into the conspiracy is a party to every act which has before been done by the others and to every act by the others afterward in furtherance of the common design." Owens, 84 Tenn. at 4.

Casual conversation between or among co-conspirators is not considered to be in furtherance of the conspiracy. See Hutchison, 898 S.W.2d at 170. In addition, where a conspirator is apprehended and "tells all to the police, it is unlikely the confession is admissible as a conspirator statement." Walker, 910 S.W.2d at 386. Under those circumstances, the statement "becomes only a narrative statement of past conduct between conspirators." Id.

Applying these principles, we agree that Hines' testimony about the statements Jonathan Montgomery made when asking to borrow Hines' car was properly admitted under the co-conspirator hearsay exception. As previously stated, Hines testified that Jonathan Montgomery "beeped" him around 8:45 p.m. on February 24, 1994, and said, "Man, a n----r got them folks." When Hines asked, "What folks?" Jonathan replied, "Cello and them" and said something about stealing $200,000. Jonathan indicated he could not talk more on the telephone and arranged to meet Hines in person. When Jonathan arrived at Hines' home around 9:00 p.m., Jonathan told Hines, "man, we got them folks out at the cemetery on Elvis Presley, and we got $200,000. Man a n----r had to kill them folks."[41] According to Hines, at this point James Montgomery "beeped in" and talked with Jonathan, and after this conversation, Jonathan asked Hines to drive him to the cemetery. Hines refused to drive Jonathan but allowed him to borrow his car.

The record does not support Carruthers' assertion that the conspiracy had ended by the time Jonathan Montgomery made these statements. In fact, Nakeita Shaw testified that she saw two of the victims, Marcellos Anderson and Frederick Tucker, leave her home alive around 10 p.m. with

---

[41]Hines explained that Jonathan Montgomery "was saying – like if I was telling you, Man, I had to kill them folks."

James Montgomery and Carruthers. In addition, the record demonstrates that Marcellos Anderson's Jeep Cherokee was burned much later at 2:40 a.m. in Mississippi. Clearly, the conspiracy had not ended when Jonathan Montgomery made these statements at around 8:45 to 9:30 p.m. In addition, the record reflects that the statements were made in furtherance of the conspiracy. Jonathan contacted Hines and made these statements to obtain transportation to the cemetery so he could assist his co-conspirators in completing the conspiracy. We therefore hold that the testimony of Chris Hines about the statements Jonathan Montgomery made to him on the night of the murders, February 24, 1994, was properly admitted pursuant to the co-conspirator hearsay exception to the hearsay rule.

However, as the Court of Criminal Appeals held, the statements Jonathan Montgomery made to Hines at the car wash on the morning after the murders were not admissible under the co-conspirator exception. As previously stated, Hines testified that Jonathan repeatedly told him at the car wash that "they had to kill some people." These statements were not made while the conspiracy was ongoing, nor were these statements in furtherance of the conspiracy. These statements are best described as a narrative "of past conduct between conspirators" and therefore were inadmissible. See Walker, 910 S.W.2d at 386. Nonetheless, we agree with the Court of Criminal Appeals that the erroneous admission of testimony about these statements is harmless error. This testimony is consistent with and merely cumulative of Hines' testimony about Jonathan's statements on the night of the murders which were properly admitted under the co-conspirator exception.

Finally, we also agree with the Court of Criminal Appeals that reversal is not required because the trial court refused to allow Carruthers to question Detective Ruby about the content of Jonathan Montgomery's statements to the police. This testimony clearly was not admissible under the co-conspirator hearsay exception. When a co-conspirator "tells all to the police, it is unlikely the confession is admissible as a conspirator statement." Walker, 910 S.W.2d at 386. Even assuming the statement would have been admissible under the hearsay exception for statements against penal interest,[42] any error in excluding the evidence was harmless. The statements Jonathan Montgomery made to the police implicated Carruthers and would have been prejudicial to his defense. This claim is without merit.

### Sufficiency of the Evidence

Both Carruthers and Montgomery challenge the sufficiency of the convicting evidence. Carruthers argues that the witnesses against him were not credible and that the State relied too heavily on the testimony of convicted felons. Montgomery complains that had he been tried separately, the circumstantial evidence admissible against him at a separate trial would have been insufficient.

---

[42] Since Jonathan placed himself at the scene of the murders, these statements might have been admissible as statements against penal interest. See Tenn. R. Evid. 804(3). We note, however, that the trial court was not asked to admit these statements under Rule 804(3) and therefore never considered its applicability.

The proper inquiry for an appellate court determining the sufficiency of evidence to support a conviction, is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id. Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn.1985)). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. See Hall, 8 S.W.3d at 599; Bland, 958 S.W.2d at 659.

At the time this offense was committed, first degree murder was defined as an "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1)(1991).[43] "Intentional" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1991). Premeditation, on the other hand, requires "the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991). Finally, deliberation requires proof of a "cool purpose" that includes some period of reflection during which the mind is free from passion and excitement. See Tenn. Code Ann. § 39-13-201(b)(1) (1991).

The elements of premeditation and deliberation are questions of fact to be resolved by the jury. See Bland, 958 S.W.2d at 660. These elements may be established by proof of the circumstances surrounding the killing. Id.; see also State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992). As we stated in Bland, there are several factors which tend to support the existence of these elements including: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Bland, 958 S.W.2d at 660; Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

---

[43]The statute has since been amended and no longer requires proof of deliberation. See Tenn. Code Ann. § 39-13-202(a)(1) (1999 Supp.) ("(a) First degree murder is: (1) [a] premeditated and intentional killing of another. . . .").

-41-

Having reviewed the proof in the light most favorable to the State, as we are required to do, we agree with the Court of Criminal Appeals that the evidence is legally sufficient to support the jury's verdicts as to each defendant. The trial proof has been thoroughly and fully summarized. With respect to Carruthers' challenges to the State's witnesses, suffice it to say that, through cross-examination, the jury was made aware that some of the witnesses had prior felony records, that some of the witnesses admitted to past drug dealing, and that some of the witnesses had given inconsistent statements to the police regarding the events of February 24 and 25, 1994. However, the jury resolved these issues of credibility in favor of the State, and an appellate court may not reconsider the jury's credibility assessments. Moreover, while we have already resolved the severance issue in favor of Montgomery, we reject his claim that the circumstantial evidence was legally insufficient. In our view, the evidence is legally sufficient. See Footnote 37, supra (discussing the applicability of the co-conspirator hearsay exception).

### Issuance of Gag Order

Carruthers next argues that the trial court committed reversible error by issuing a "gag order" preventing him from speaking to the media.[44] The trial court's order, issued about a month before the trial began, states:

> The Constitutions of the United States and the State of Tennessee guarantee defendants in all criminal cases due process of law and the right to a fair and impartial jury. It is the duty of the trial court to see that every defendant is afforded all his constitutional rights.

\

> In order to safeguard those rights, this Court is of the opinion that the following rule is necessary to constitutionally guarantee an orderly and fair trial by an impartial jury. Therefore, this Court orders the following:

> All lawyers participating in this case, including any defendants proceeding pro se, the assistants, staff, investigators, and employees of investigators are forbidden to take part in interviews for publicity and from making extra-judicial statements about this case from this date until such time as a verdict is returned in this case in open court.

> Because of the gravity of this case, because of the long history of concerns for the personal safety of attorneys, litigants and witnesses in this case, because of the potential danger – believed by this Court to be very real and very present – of undermining the integrity of the judicial system by "trying the case in the

---

[44]The trial court also issued a gag order preventing the media from publishing the names of certain prosecution witnesses, which was later modified to prevent the publication of only one prosecution witness. The Court of Criminal Appeals vacated this order, holding that it was a prior restraint in violation of the First Amendment to the United States Constitution. State v. Montgomery, 929 S.W.2d 409 (Tenn. Crim. App. 1996). The gag order prohibiting the attorneys and Carruthers from talking to the media, however, remained in place throughout trial.

media" and of sullying the jury pool, this Court feels compelled to adopt this extraordinary pretrial measure.

Carruthers challenges this order as violating his right to a fair trial, guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Carruthers is correct to rely upon the Sixth Amendment. We note, however, that the United States Supreme Court has stated that a "right to fair trial" claim also implicates the Fifth and Fourteenth Amendment Due Process Clauses. See, e.g., Strickland v. Washington, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 2063, 80 LED.2d 674 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment."). Nonetheless, numerous courts have referred simply to the Sixth Amendment right to a fair trial in this context, and we will do the same. See, e.g., In re Dow Jones & Co., Inc., 842 F.2d 603, 609 (2d Cir.), cert. denied, 488 U.S. 946, 109 S. Ct. 377, 102 L.Ed.2d 365 (1988); United States v. Ford, 830 F.2d 596, 600 (6th Cir. 1987).

Carruthers also raises First Amendment concerns, which is understandable given that gag orders exhibit the characteristics of prior restraints. See United States v. Brown, 218 F.3d 415, 424 (5th Cir. 2000). But see Dow Jones, 842 F.2d at 608 (noting a "substantial difference" between a restraint on the press and a restraint on trial participants). Yet the crux of Carruthers' argument on appeal is that his defense was inhibited because he could not respond to the media's coverage of the trial; he could do nothing to alter the jurors' preconceptions about the case gained from their exposure to news reports. Carruthers also argues that his inability to speak to the press may have prevented potential witnesses from coming forward to his defense. Properly stated, then, his argument asserts that the gag order interfered with his right to a fair trial. To the extent Carruthers' brief raises a First Amendment claim, however, we find it moot. By its own terms, the trial court's order ceased to exist upon the return of the verdict, which occurred several years ago. Of course, since a gag order is by definition a restriction on speech, our review of Carruthers' Sixth Amendment claim demands consideration of First Amendment principles. As is clear from the case law, discussed below, the proper standard governing the validity of gag orders explicitly incorporates these principles, as do we in our analysis.

The Court of Criminal Appeals rejected Carruthers' arguments and upheld the gag order in its entirety. As noted in its opinion, the following circumstances were considered by the trial court as reasons for issuing the gag order: numerous threats to attorneys; the death of one of the co-defendants; the highly-charged emotional climate of the trial (e.g., the courtroom was guarded by S.W.A.T. team members); the gunning down of a deputy jailer in his driveway, which the trial judge thought was related to the case; the fleeing of one witness after reading about the case in the newspaper; and the statements of two witnesses who had already testified that defendant Montgomery threatened to kill them if they talked about the case. Also, as the Court of Criminal Appeals noted, Alfredo Shaw testified that Carruthers threatened him and made arrangements to have a reporter interview him about recanting his story. Thus, the court held that the trial judge was properly concerned about the media's influence on the potential jury pool and the safety of all

involved in the trial. The court also held that the public was certainly aware of the trial from the media's coverage and that Carruthers' statements to the press would not likely have led to unknown witnesses coming forward.

We agree with the Court of Criminal Appeals' judgment that under these circumstances a gag order was proper. We hold however that under the constitutional standards discussed below, the scope of that order was too broad. Nevertheless, given the circumstances of this case, the error is harmless.

Numerous courts have recognized that the correct standard by which to evaluate the constitutionality of gag orders depends upon who is being restrained: the press or trial participants. See, e.g., Brown, 842 F.2d at 425; Dow Jones, 842 F.2d at 608. If the gag order is directed to the press, the constitutional standard is very stringent. See Montgomery, 929 S.W.2d at 414 (discussing Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S. Ct. 2791, 49 L.Ed.2d 683 (1976)). Carruthers' appeal before this Court, however, concerns the trial court's gag order directed to him, a defendant, representing himself at trial.

As the United States Court of Appeals for the Fifth Circuit has recently determined, the federal circuit courts are split as to the correct constitutional standard governing gag orders on trial participants. See Brown, 218 F.3d at 425-28. For example, the Sixth Circuit has held that gag orders on trial participants must meet the exacting "clear and present danger" test for free speech cases enunciated in Near v. Minnesota, 283 U.S. 697, 51 S. Ct. 625, 75 L.Ed. 1357 (1931). See Ford, 830 F.2d at 598 ("We see no legitimate reasons for a lower standard for individuals [as compared to the press]."). Accord Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 249 (7th Cir. 1975), cert. denied, 427 U.S. 912, 96 S. Ct. 3201, 49 L.Ed.2d 1204 (1976) (applying a "serious and imminent threat" test); Levine v. United States District Court, 764 F.2d 590, 595-96 (9th Cir. 1985), cert. denied, 476 U.S. 1158, 106 S. Ct. 2276, 90 L.Ed.2d 719 (1986) (same). In contrast, the Second, Fourth, and Tenth Circuits analyze the validity of gag orders on trial participants under the less stringent standard of whether the participant's comments present a "reasonable likelihood" of prejudicing a fair trial. See Dow Jones, 842 F.2d at 610; In re Russell, 726 F.2d 1007, 1010 (4th Cir.), cert. denied, 469 U.S. 837, 105 S. Ct. 134, 83 L.Ed.2d 74 (1984); United States v. Tijerina, 412 F.2d 661, 666-67 (10th Cir.), cert. denied, 396 U.S. 990, 90 S. Ct. 478, 24 L.Ed.2d 452 (1969). See also News-Journal Corp. v. Foxman, 939 F.2d 1499, 1512-15 (11th Cir. 1991) (discussing the case law authority for the less stringent standard). Without deciding whether to adopt the "reasonable likelihood" standard, the Fifth Circuit determined that the "clear and present danger" test was not required, and analyzed the case before it under a "substantial likelihood" test. See Brown, 218 F.3d at 427-28.

Although this Court has upheld restraints on trial participants, see State v. Hartman, 703 S.W.2d 106 (Tenn. 1985) (order restraining counsel from talking with the public or media about the facts of the case), we have never discussed the underlying constitutional issues. We therefore decide this issue based on our own interpretation of United States Supreme Court precedent and the

Tennessee Constitution with guidance from the federal circuit courts.[45] We note that the Court of Criminal Appeals' opinion emphasizes that "[t]he twist in this case, however, is that Carruthers was representing himself during trial." Although this fact is relevant in applying the constitutional standard to determine whether Carruthers' right to a fair trial was breached, our review of the case law indicates that the constitutional standard is the same regardless of which trial participant is restrained.

The Brown court's decision to follow a "substantial likelihood" test rather than the "clear and present danger" test rests on its interpretation of Gentile v. State Bar of Nevada, 501 U.S. 1030, 111 S. Ct. 2720, 115 L.Ed.2d 888 (1991). The Brown court determined that Gentile rejected the clear and present danger test for trial participants and that Gentile is the Supreme Court's latest discussion of the issue. See Brown, 218 F.3d at 426-28 (noting that the cases endorsing the more stringent test predated Gentile). We agree with the Brown court's holding.

Gentile involved an attorney who held a press conference the day after his client was indicted on criminal charges. See Gentile, 501 U.S. at 1063-65, 111 S. Ct. at 2738-40 (discussing the facts). The attorney proclaimed his client's innocence, strongly suggested that a police detective was in fact the perpetrator, and stated that the alleged victims were not credible. Although the trial court "succeeded in empaneling a jury that had not been affected by the media coverage and [the client] was acquitted on all charges, the [Nevada] state bar disciplined [the attorney] for his statements." Id. at 1064, 111 S. Ct. at 2739. The Nevada Supreme Court upheld the state bar's disciplinary action, finding that the attorney "knew or reasonably should have known that his comments had a substantial likelihood of materially prejudicing the adjudication of his client's case." Id. at 1065, 111 S. Ct. at 2739. Although the Supreme Court reversed this judgment because it found the Nevada Supreme Court's construction of the disciplinary rule "void for vagueness," id. at 1048-51, 111 S. Ct. at 2731-32, a majority of the Court held that the "substantial likelihood of prejudice" test struck the proper constitutional balance between an attorney's First Amendment rights and the state's interest in fair trials. Id. at 1065-76, 111 S. Ct. at 2740-45.[46]

In so doing, the Court held that the stringent standard governing restraints on the press articulated in Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S. Ct. 2791, 49 L.Ed.2d 683 (1976) should not apply to restraints on lawyers whose clients are parties to the proceeding. Id. at 1074, 111

---

[45] Though they are persuasive authority when interpreting the United States Constitution, this Court is not bound by decisions of the federal district and circuit courts. We are bound only by decisions of the United States Supreme Court. See Strouth v. State, 999 S.W.2d 759, 769 n9 (Tenn. 1999); State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984).

[46] In Zimmermann v. Board of Professional Responsibility, 764 S.W.2d 757 (Tenn. 1989) we upheld Disciplinary Rule 7-107(B) and (E), which govern extrajudicial statements made by attorneys in criminal cases, under the Tennessee and United States Constitutions. The Zimmerman holding was, in part, based on a decision of the New Jersey Supreme Court analyzing the balance between First Amendment rights and the need to ensure the fair administration of justice. Zimmermann, 764 S.W.2d at 761 (discussing In Re Rachmiel, 90 N.J. 646, 449 A.2d 505 (1982)). Both Zimmerman and In Re Rachmiel, however, were decided before Gentile. In light of Gentile, we have reconsidered the constitutional issues at stake under both the Tennessee and United States Constitutions.

S. Ct. at 2744. See also News-Journal Corp., 939 F.2d at 1512-13 (noting that the Supreme Court has suggested restricting trial participants as an *alternative* to a prior restraint on the media). The Court quoted with approval from Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507, 16 L.Ed.2d 600 (1966) in which the defendant's conviction was overturned because of prejudicial publicity that prevented him from receiving a fair trial:

> The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures. 384 U.S. at 363, 86 S. Ct. at 1522.

Id. at 1072, 111 S. Ct. at 2743.

As the Brown court held, however, see Brown, 218 F.3d at 426, the Court in Gentile did not conclude that the "substantial likelihood of prejudice" test was required; it held only that this test complies with the First Amendment. See Gentile, 501 U.S. at 1075, 111 S. Ct. at 2745 ("We agree with the majority of the States that [this standard] constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials."). Moreover, Gentile involved a restraint on an attorney's speech; in this case, Carruthers was a party as well as his own attorney. It is necessary, therefore, to decide whether the Gentile rationale applies to parties.

Although unnecessary to its holding, we find significant evidence in the Gentile opinion that the clear and present danger test is not required for gag orders restraining parties or other trial participants. The Court emphasized the distinction between "participants in the litigation and strangers to it" as recognized by an earlier case, Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S. Ct. 2199, 81 L.Ed.2d 17 (1984). Id. at 1072-73, 111 S. Ct. at 2743-44. As characterized by the Gentile Court, the Court in Seattle Times "unanimously held that a newspaper, which was itself a defendant in a libel action, could be restrained from publishing material about the plaintiffs and their supporters to which it had gained access through court-ordered discovery." Id. at 1073, 111 S. Ct. at 2744. The Gentile Court then quoted from Seattle Times as follows: "[a]lthough litigants do not 'surrender their First Amendment rights at the courthouse door,' those rights may be subordinated to other interests that arise in this setting" (citation omitted); and further, "on several occasions [we have] approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant." Id. The Court also stated that "[f]ew, if any interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." Id. at 1075, 111 S. Ct. at 2745 (citing Sheppard, 384 U.S. at 350-51, 86 S. Ct. at 1515-16).

We conclude that the concerns raised in <u>Gentile</u> and <u>Sheppard</u> are applicable regardless of whether a party or his or her attorney is being restrained. A prejudicial statement made to the press by an attorney is not somehow less prejudicial if made by a party. In short, what matters is *what* is being said and not *who* is saying it. <u>See Brown</u>, 218 F.3d at 428 ("As the district court pointed out, trial participants, like attorneys, are 'privy to a wealth of information that, if disclosed to the public, could readily jeopardize the fair trial rights of all parties.'"). If anything, as one court has reasoned, extrajudicial comments made by trial participants have the potential to be more harmful than comments made by attorneys:

> <u>Gentile</u> involved a state supreme court rule governing the conduct of members of the bar of that state, while we examine a state trial court's restrictive order entered in a particular case and directed to all trial participants. Because of their legal training, attorneys are knowledgeable regarding which extrajudicial communications are likely to be prejudicial. The other trial participants encompassed by the restrictive order in this case did not have such legal discernment and expertise. Given the public attention generated by this case, defendants, witnesses and law enforcement personnel were eager to talk with the press concerning their particular views. While attorneys can be governed by state supreme court or bar rules, other trial participants do not have these guidelines. <u>News-Journal Corp.</u>, 939 F.2d at 1515 n.18.

Thus, we conclude that for purposes of the constitutional right to a fair trial, <u>Gentile</u>'s rationale applies to all trial participants, meaning that the more stringent clear and present danger test is not required.

Having decided that the clear and present danger test is not constitutionally mandated, we must now decide which test to adopt: the "substantial likelihood of prejudice" test or, as some courts have employed, the "reasonable likelihood" test. As noted, <u>Gentile</u> held only that the substantial likelihood test was constitutional, not that it was required. <u>See Brown</u>, 218 F.3d at 426-28; <u>News-Journal Corp.</u>, 939 F.2d at 1515 n.18. Nonetheless, we conclude under both the state and federal constitutions that the substantial likelihood test strikes a constitutionally permissible balance between the free speech rights of trial participants, the Sixth Amendment right of defendants to a fair trial, and the State's interest in a fair trial. <u>Cf</u>. <u>Gentile</u>, 501 U.S. at 1070, 111 S. Ct. at 2742. Accordingly, we hold that a trial court may constitutionally restrict extrajudicial comments by trial participants, including lawyers, parties, and witnesses, when the trial court determines that those comments pose a substantial likelihood of prejudicing a fair trial.

Under this constitutional standard, we hold that the trial court was justified in imposing a gag order on Carruthers. At trial, this case garnered a significant amount of media coverage, raising the concerns expressed in <u>Sheppard</u>. As Carruthers himself notes in his brief:

> This trial was charged with emotion from start to finish. There were allegations of gang affiliations and testimony of large scale narcotics dealings. The courtroom was guarded by S.W.A.T. team members and by Sheriff's deputies who were authorized

to search those entering the courtroom. Representatives of news organizations were present daily to record the proceedings.

In addition to its concerns about media coverage, the trial court was presented with the problem of witness intimidation. The trial judge found that witnesses who had already testified stated that defendant Montgomery threatened to kill them if they talked. Moreover, Alfredo Shaw testified that Carruthers had threatened him and made arrangements to have a reporter interview him about recanting his story. Under these unusual circumstances, the trial court was justified in employing heightened measures to ensure that a proper jury could be found and to prevent Carruthers from manipulating the media so as to intimidate witnesses. The trial judge could not ignore these issues. Indeed, he had a constitutional duty under the state and federal constitutions to ensure a fair trial.

Before a gag order can be entered, however, the case law suggests that a trial court should consider reasonable alternative measures that would ensure a fair trial without restricting speech. In the context of restraints on the press, the United States Supreme Court has specifically held that a trial court should consider such measures. See Nebraska Press, 427 U.S. at 563-64, 96 S. Ct. at 2804-05. These measures include: a change of trial venue; postponement of the trial to allow public attention to subside; searching questions of prospective jurors; and "emphatic" instructions to the jurors to decide the case on the evidence. Id. (discussing Sheppard, 384 U.S. at 357-62, 86 S. Ct. at 1519-22).

Although it is not clear whether the need to consider alternatives is also necessary in the context of restraints on trial participants, some federal circuit courts have assumed so, see, e.g., Brown, 218 F.3d at 430-31; Dow Jones, 842 F.2d at 611-12, and the trial judge considered several of the alternatives. The trial court found that neither a change of venue nor a continuance was practical because the case was several years old and one attempt to try the case had already been made. The court appropriately gave careful attention to voir dire and jury instructions, but determined that these alternatives alone were insufficient.

Given the extraordinary nature of this case, we hold that the trial court was entitled to make this judgment. We also note that in addition to and apart from the concerns about pretrial publicity interfering with the task of finding an unbiased jury, the trial court was concerned about witness intimidation and Carruthers' potential manipulation of the press. None of the alternatives mentioned in Nebraska Press and Sheppard would likely have alleviated these concerns. The trial court reasonably concluded that only a gag order would be effective. Finally, we note that the alternatives mentioned above are not free of cost to the judicial system. As the Gentile Court wrote:

Even if a fair trial can ultimately be ensured through voir dire, change of venue, or some other device, these measures entail serious costs to the system. Extensive voir dire may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of criminal trials, a change of venue may not suffice to undo the effects of statements such as those made by the petitioner. Gentile, 501 U.S. at 1075, 111 S. Ct. at 2745.

Having decided that the trial court did not err in issuing the gag order, the final issue to consider is the scope of the order. As discussed above, Carruthers' argument on appeal is properly construed as a "right to fair trial" claim rather than a First Amendment claim. Nevertheless, a gag order by definition restricts speech. In determining whether a gag order is appropriate, therefore, a court must be mindful that "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S. Ct. 2746, 2758, 105 L.Ed.2d 661 (1989); see also Procunier v. Martinez, 416 U.S. 396, 413, 94 S. Ct. 1800, 1811, 40 L.Ed.2d 224 (1974) (the limitation on speech "must be no greater than is necessary or essential to the protection of the particular governmental interest involved") (quoted in Brown, 218 F.3d at 429).

On its face, the trial court's order has no exceptions or limitations: it prohibits the defendants and their attorneys from making *any* comments to the press about the case. This gag order is considerably broader than any upheld in the cases discussed above. Gentile, though not a gag order case, involved a limitation on attorney speech which prohibited only statements "substantially likely to prejudice" the adjudication of the case. See Gentile, 501 U.S. at 1064, 111 S. Ct. at 2739. Brown involved an order which "left available to the parties various avenues of expression, including assertions of innocence, general statements about the nature of an allegation or defense, and statements of matters of public record." Brown, 218 F.3d at 429-30. The order in Dow Jones was similar. See Dow Jones, 842 F.2d at 606.

Given the history of this trial, we certainly understand why the trial court crafted such a broad order. Indeed, in certain cases, as where a defendant takes advantage of a limited gag order or fails to comply with it, an order of such breadth may be justified. Nonetheless, we hold that initial gag orders on trial participants should ordinarily contain the exceptions found in the Brown order and allow trial participants to make general statements asserting innocence, commenting on the nature of an allegation or defense, and discussing matters of public record.

We find the trial court's failure to include these exceptions in the gag order was harmless error. We fail to see how limited statements made by Carruthers to the media about his innocence, allegations or defenses, or matters in the public record would have altered the result of the trial. We do not think that allowing Carruthers to make such statements would have furthered the goal of finding an impartial jury, nor do we think it probable that any new witnesses would have come forward. We also point out that these crimes occurred in 1994, and the gag order was issued only one month before trial in 1996. In the two years preceding issuance of the gag order, Carruthers had access to the media. The record shows both that he availed himself of that access and that the media responded by actively covering the trial and events leading up to the trial. Under these circumstances, the error below was harmless.

### Sentencing: Non-Capital Offenses

Citing state and federal constitutional provisions and Tennessee Rule of Criminal Procedure 43, Carruthers next contends that his right to be present at a crucial stage of his criminal proceeding was violated when the trial judge conducted the sentencing hearing on his convictions for especially

aggravated robbery and especially aggravated kidnapping in his absence. The State responds that Carruthers waived his right to be present because he was voluntarily absent from the sentencing hearing. We agree.

The record reflects that immediately after the sentencing verdict was rendered on the capital offenses, the trial judge announced that the sentencing hearing for the non-capital offenses would be held on May 20, 1996. Carruthers was present when this announcement was made. The trial judge was prepared to proceed with the sentencing hearing on that date. Because of a misunderstanding about which law enforcement agency was responsible for transporting the defendants from the prison facility outside of Nashville to Memphis, neither Carruthers nor Montgomery were present in court. The hearing was rescheduled for May 28, 1996, but the trial judge announced that day that because of security concerns the hearing would be held the next day, May 29, 1996, at the Riverbend Maximum Security Institution in Nashville where Carruthers and Montgomery were incarcerated.[47] The defendants were not present in court when this announcement was made, and the record does not indicate that the defendants were personally notified of the change in date and location of the sentencing hearing. Counsel for Montgomery and the attorneys appointed to represent Carruthers on the new trial motion and on appeal previously had been advised at a meeting in chambers of the trial court's decision to hold the hearing at Riverbend.

When the trial judge convened the hearing at Riverbend the next day, Carruthers and Montgomery refused to attend or participate although they were present in a holding room approximately twenty to thirty feet from the hearing room. Warden Ricky Bell informed the trial court that defendant Carruthers was refusing to participate. Counsel informed the trial judge that despite a lengthy conference in which he had been advised to appear Montgomery also was refusing to appear, purportedly because of the presence of media personnel. The trial judge recessed the hearing to allow counsel to confer with Montgomery and to allow Warden Bell to confer with Carruthers and to inform him that the restraints would be removed if he decided to participate in the sentencing hearing.

When the hearing resumed, Warden Bell announced that Carruthers understood his restraints would be removed, but he was still refusing to attend or participate in the hearing. Carruthers had provided no explanation for his refusal. Counsel for Montgomery reported that he also was still refusing to attend or participate and that he was objecting to the hearing because it was not being

---

[47]As the Court of Criminal Appeals recognized, the trial judge had the discretion to conduct the sentencing hearing at Riverbend if security was a concern pursuant to Tenn. Code Ann. § 16-1-105 (1999 Supp.), which provides as follows:

> [i]f for any cause, in the opinion of the court deemed sufficient, it is impracticable or inconvenient for any court to hold its session at the courthouse, or place designated by law, it shall be lawful for the court to hold its session, or any part of its session, at any other room within the limits of the county seat, or at any other room open to the public within an institution of the department of correction or the department of children's services if the court deems it necessary, and all its proceedings at such place, whether in civil or criminal cases, are as valid as if done at the courthouse.

(Emphasis added.)

held in a public place.[48]  Warden Bell was sworn and testified about his conversation with Carruthers, including Carruthers' refusal to attend despite assurances that his restraints would be removed.  Following Warden Bell's testimony, the trial judge observed that he had two options:

> to drag them out here against their will, kicking and screaming, and strap them down to a chair and force them to sit here.  Or allow them to remain in the holding room and go forward with the proceedings in their absence.  And I think that the wiser course, the more prudent course, the course that the law would suggest be taken is the latter.  We are going to proceed in their absence, since they have both voluntarily elected to absent themselves from these proceedings.  If an individual were allowed to delay or disrupt proceedings simply by stating that he did not want to be present, then the entire judicial system would grind to a halt very quickly.

Noting that "a full and complete" sentencing hearing had already been held in conjunction with the murder convictions and that any additional witnesses would likely be "cumulative witnesses to what has already been testified to at the first sentencing hearing," the trial judge decided to proceed with the sentencing hearing.

The State called one witness, an employee of the Shelby County Criminal Court Clerk's Office, who testified that Carruthers had pled guilty to two counts of aggravated assault in 1990 and had been sentenced to ten years and five years on those convictions.  The State also relied upon the evidence adduced at both the guilt and sentencing phases of trial and the pre-sentence report prepared as to each defendant.

Following the State's proof, the trial court once again took a recess to allow counsel to confer with Montgomery to determine if he had decided to participate in the hearing and to enable Warden Bell to speak with Carruthers and advise him that he could testify if he so desired.

Counsel returned and informed the trial judge that Montgomery was still refusing to participate or testify in the hearing.  They also advised the trial court that they did not intend to present any proof and that no proof would have been presented had the hearing been held in Memphis.  Warden Bell returned after what was his third conversation with Carruthers and again advised the trial judge that he still was refusing to attend or participate in the hearing.  Following argument, the trial judge imposed a forty-year sentence on each of the four convictions for each defendant and ordered that two of the sentences for especially aggravated kidnapping run concurrent to the other sentences and to the death penalty, with all other sentences running consecutive to each other and to the death penalty.

Initially we acknowledge that the right of a criminal defendant to be present at all critical stages of a criminal proceeding derives from several sources, including both the federal and state

---

[48]The record reflects that the public was not excluded from the hearing room at Riverbend.

constitutions. See United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) ("The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, . . . but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him."); State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998) ("Article I, § 9 of the Tennessee Constitution provides that 'the accused hath the right to be heard by himself and his counsel.'  The 'right to be heard by himself' requires the presence of the defendant during the entire trial.").

In addition to constitutional protection, the right of a criminal defendant to be present at critical stages of a criminal proceeding also is protected by Tennessee Rule of Criminal Procedure 43(a), which provides:

> Unless excused by the court upon defendant's motion, the defendant shall be present at arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

(Emphasis added.)

Like many other constitutional and statutory rights, however, the right to be present may be waived by a criminal defendant.  See Muse, 967 S.W.2d at 764.  Voluntary absence after the trial has commenced or disruptive in-court behavior may constitute waiver of the right to be present. Id. at 767.  With respect to waiver by voluntary absence,  Tenn. R. Crim. P. 43(b) provides in relevant part:

> (b)The further progress of the trial to and including the return of the verdict and imposition of sentence shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present:
>
> > (1)voluntarily is absent after the trial has commenced (whether or not he or she has been informed by the court of the obligation to remain during the trial) . . . .
> >
> > (2) . . .If a trial proceeds in the voluntary absence of the defendant . . . he or she must be represented in court by competent counsel . . . .

Construing subsection (b) only seven years after Rule 43 was adopted, the Court of Criminal Appeals explained that

> [a]n accused who has notice of the time and place of the trial and of his right to attend, and who nonetheless voluntarily absents himself, will be deemed to have waived his right to be present.

-52-

> [T]he court should indulge every reasonable presumption against a waiver. Counsel should be given a reasonable opportunity to locate his client, and there should be affirmative evidence that the accused was informed of his trial date. We think it is wise to take special precautions when a defendant fails to appear on the date set for trial and to require a high standard of proof that the defendant knew his trial date and that his absence is voluntary. Trial in his absence is not favored, and proceeding with trial only to find later that defendant did not know his trial date or did not voluntarily absent himself would run counter to the purposes expressed in [Tenn. R. Crim. P.] 2. Mere absence at the time the case is called for trial is insufficient to show a waiver of the right to be present.

State v. Kirk, 699 S.W.2d 814, 819 (Tenn. Crim. App. 1985); see also Muse, 967 S.W.2d at 767 (quoting and approving of this analysis from Kirk). Applying this analysis, the Court of Criminal Appeals in Kirk concluded that the defendant had waived his right to be present when he escaped from custody after he had appeared in court and had been advised of the date on which his trial would begin. See Kirk, 699 S.W.2d at 819.

Two years ago in Muse this Court applied the Kirk analysis in a case in which the defendant did not appear for jury selection proceedings because he was not aware that the trial judge had rescheduled the proceedings at the request of defense counsel. Concluding that Muse had been deprived of his right to be present at jury selection and that the deprivation constituted prejudice to the judicial process, this Court reversed his conviction and remanded for a new trial. See Muse, 967 S.W.2d at 768.

For purposes of this appeal, we have accepted Carruthers' contention that he had both a constitutional right to be present and a right to be present under Tenn. R. Crim. P. 43(a), and we have concluded that Carruthers waived those rights. Carruthers was aware a sentencing hearing would be held, and he was present when the hearing initially was scheduled. While the hearing did not occur on the date originally scheduled, the hearing was held on May 29, a delay of only nine days. The record does not reflect exactly when Carruthers became aware that the hearing would be held at Riverbend on May 29, but there is no doubt that he was aware a hearing was about to be held when he was in the holding area near the public hearing room.

This is not a case where waiver was presumed from Carruthers' mere absence at the time the sentencing hearing convened. The trial judge made every effort to persuade Carruthers to attend the hearing. On three separate occasions, the trial judge instructed Warden Bell to confer with Carruthers and attempt to persuade him to appear. On each of those occasions, the record reflects that Warden Bell assured Carruthers his restraints would be removed and emphasized his right to make a statement at the hearing.[49] Under these circumstances, we have no hesitation in concluding that Carruthers waived his right to be present at sentencing.

---

[49] Contrary to Carruthers' assertions on appeal, Warden Bell gave sworn testimony about his conversations with Carruthers.

Finally, pointing to Tenn. R. Crim. P. 43(b)(2), which provides that "[i]f a trial proceeds in the voluntary absence of the defendant, . . . he or she must be represented in court by competent counsel," the defendant argues that even if he waived his right to be present, he is entitled to a new sentencing hearing because the trial judge did not appoint competent counsel to represent him.

Without question, the scenario that arose in this case is uncommon. In most instances, a voluntarily absent criminal defendant will already be represented by counsel and therefore will continue to be represented by counsel in proceedings that occur in his or her absence. Here, because the defendant had forfeited his right to counsel, there was no attorney present to represent him in the sentencing hearing.

In our view, the decision of whether or not to appoint counsel to represent a voluntarily absent defendant who previously has forfeited his right to counsel should be determined by the trial court on a case-by-case basis. The trial court is most familiar with the case and is in the best position to determine if an attorney should be appointed. Appellate courts should defer to the trial court's decision on this issue unless the record demonstrates a clear abuse of discretion. Cf. Small, 988 S.W.2d at 674.

The trial judge concluded that appointment of counsel was unnecessary. The proof presented by the State was, as the trial judge found, largely cumulative to the proof already presented at the sentencing hearing on the murder convictions. There is nothing in the record to suggest that Carruthers had intended to offer any additional proof at the sentencing hearing. Even on appeal, Carruthers' attorneys have not pointed to proof that would have been presented had Carruthers been present or represented by counsel at the hearing. They simply assert that "the trial judge presumed that Carruthers would have offered the same proof" as that offered at the capital sentencing hearing and state, "[w]hether or not this is true, we will never know." Given the circumstances of this case, we conclude that the trial court did not abuse its discretion in failing to appoint counsel to represent Carruthers when he was voluntarily absent from the sentencing hearing.

## Proportionality Review[50]

Finally, we consider whether Carruthers' sentence of death is comparatively disproportionate considering the nature of the crime and the defendant.[51] We begin, as always, with the proposition

---

[50] Because of the reversal and remand, we forego statutory review of the proportionality of the death sentences imposed against Montgomery. See State v. Bondurant, 4 S.W.3d 662, 675 (Tenn. 1999); State v. Bigbee, 885 S.W.2d 797, 817 (Tenn. 1994).

[51] Initially we note that Carruthers has not challenged the proportionality of his death sentences or the sufficiency of the evidence supporting the aggravating circumstances. As a result, Carruthers has not briefed these issues. The Court of Criminal Appeals correctly pointed out that:

the State and the defendant in each case must fully brief the issue by specifically identifying those similar cases relevant to the comparative proportionality inquiry. When addressing proportionality review, the briefs of the parties shall contain a section setting forth the nature and circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted, including

(continued...)

-54-

that the sentence of death is proportional to the crime of first-degree murder. State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). Comparative proportionality review of capital cases is designed to insure "rationality and consistency in the imposition of the death penalty." Bland, 958 S.W.2d at 665. A death sentence will be considered disproportionate if the case, taken as a whole, is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Id. However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. State v. Smith, 993 S.W.2d 6, 17 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 281 (Tenn. 1998); Bland, 958 S.W.2d at 665. Our role in conducting proportionality review is not to assure that a sentence "less than death was never imposed in a case with similar characteristics." Blanton, 975 S.W.2d at 281; Bland, 958 S.W.2d at 665. "'Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.'" Bland, 958 S.W.2d at 665 (quoting Gregg v. Georgia, 428 U. S. 153, 203, 96 S. Ct. 2909, 2939, 49 L.Ed.2d 859 (1976)). Instead, our duty in conducting proportionality review "is to assure that no aberrant death sentence is affirmed." Bland, 958 S.W.2d at 665.

In performing this duty, we do not utilize a mathematical formula or scientific grid. The test is not rigid. Id. To conduct proportionality review, we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. Bland, 958 S.W.2d at 666. "'[B]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar . . . are those in which imposition of the death penalty was properly before the sentencing authority for determination.'" Bland, 958 S.W.2d at 666 (quoting Tichnell v. State, 468 A.2d 1, 15-16 (Md. 1983)).[52] In choosing and comparing similar cases, we consider many variables, some of

[51] (...continued)
the statutory aggravating circumstances found by the jury and the evidence of mitigating circumstances. In addition, the parties shall include in the section a discussion of the character and record of the defendants involved in the crimes, to the extent ascertainable from the Rule 12 reports, appellate court decisions, or records of the trials and sentencing hearings in those cases.
958 S.W.2d at 667 (footnote omitted). The Tennessee CD-Rom death penalty database, mentioned in Bland, 958 S.W.2d at 667 n.18, may be now obtained from the Administrative Office of the Courts.

[52] The pool from which similar cases are drawn has increased substantially since the capital punishment statute was enacted in 1977. The first decision to comprehensively discuss comparative proportionality review was State v. Barber, 753 S.W.2d 659 (Tenn. 1988). However, this Court had conscientiously performed comparative proportionality in the fifty-seven capital cases preceding Barber. Not only had we considered those fifty-seven capital cases, we also had reviewed innumerable cases in which a sentence of life imprisonment had been imposed for first degree murder. Three years ago in Bland, this Court once again thoroughly explained both the role of comparative proportionality review and the method by which this review is performed in Tennessee. With the decision in Bland, this Court had reviewed one hundred and ten capital cases, again, in addition to the innumerable cases involving a sentence of life imprisonment or life imprisonment without the possibility of parole. The pool of capital cases had almost doubled in
(continued...)

which include (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667. When reviewing the characteristics of the defendant, we consider: (1) any prior record or prior criminal activity; (2) age, race, and gender; (3) mental, emotional or physical condition; (4) involvement or role in the murder; (5) cooperation with authorities; (6) remorse; (7) knowledge of the helplessness of the victim; and (8) capacity for rehabilitation. Id.

Considering the circumstances of these murders in light of the relevant comparative factors, we note that the three victims were kidnapped, bound, shot, and buried alive, in a pit beneath another person's grave. The killings apparently were motivated by Carruthers' desire to rob Marcellos Anderson, a successful and wealthy drug dealer. These murders were committed in a particularly cruel manner, and the proof indicates that the victims were maliciously mistreated before they were buried alive. The medical testimony indicated that the victims were bound and abused for sometime before being shot and buried alive. The murders clearly were premeditated, and there was no provocation or justification for the killings.

Carruthers, who was twenty-six-years old when these crimes were committed, had an extensive prior criminal record. There is no evidence that Carruthers was mentally or emotionally impaired at the time these crimes occurred, and the record reflects that Carruthers was instrumental in planning these killings and suggesting a location to bury the bodies. Carruthers did not cooperate with the authorities at all, nor has he shown any remorse for the killings. In addition, given his extensive criminal record, it is unlikely that Carruthers has a capacity for rehabilitation. Considering the nature of these crimes and the character of Carruthers, we conclude that these murders place Carruthers into the class of defendants for whom the death penalty is an appropriate punishment. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case. See State v. Farris Morris, __ S.W.3d__ (Tenn. 2000) (brutal killing of innocent family members occurred during a robbery to obtain drugs and the jury found similar aggravating circumstances); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998) (killing of woman in her home by a young male defendant who told others the killing was a "hit" and the jury found similar aggravating circumstances ) State v. Burns, 979 S.W.2d 276 (Tenn. 1998) (killing of other young males during a robbery by a young male defendant); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (brutal killing of three victims involving similar aggravating circumstances); State v. Jones, 789 S.W.2d 545 (Tenn. 1990) (brutal drug-related killing in which the victim was stabbed to death after being bound, gagged, and blindfolded with duct tape; similar aggravating circumstances); State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985) (killing in a drug deal involving similar aggravating

---

[52](...continued)
the nine years from Barber to Bland. Since Bland, this Court has reviewed approximately twenty more capital cases. If the size of the comparison pool was ever a concern, it is a concern no longer. The pool from which similar cases is drawn clearly is large enough to enable an effective comparative review,

circumstances). Other similar death penalty cases are <u>State v. Hutchison</u>, 898 S.W.2d 161 (Tenn. 1994)(murder of victim to obtain life insurance proceeds as part of a conspiracy among a group of men); <u>State v. Edward Leroy Harris</u>, 839 S.W.2d 54 (Tenn. 1992)(double murder of hotel clerk and security guard during robbery involving multiple defendants and similar aggravating circumstances); <u>State v. Groseclose and Rickman</u>, 615 S.W2d 142 (Tenn. 1981)(murder resulted from an elaborate plan to kill the wife of one of the defendants in a particularly cruel way and involved two similar aggravating circumstances).[53]

Review of the above cases, and many others, reveals that the death sentences imposed by the jury for Carruthers' first degree murder convictions are proportionate to the penalty imposed in similar cases.

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentences of death imposed for Carruthers' three convictions of first degree murder were not imposed arbitrarily, that the evidence supports the jury's findings of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

### **Conclusion**

With respect to Carruthers, we conclude that none of the alleged errors require reversal. Accordingly, we affirm Carruthers' convictions and sentences and direct that the sentences of death be carried out as provided by law on the 11th day of April, 2001, unless otherwise ordered by this Court or proper authority.

With respect to Montgomery, we conclude that a severance should have been granted when he raised the issue in his motion for new trial and that the failure to grant a severance in this case resulted in prejudicial error requiring a new trial. Accordingly, we reverse Montgomery's convictions and remand for a new trial.

---

[53]Although lesser sentences have been imposed in some similar first degree murder cases, many of these sentences resulted from plea agreements and therefore are not relevant for purposes of comparative proportionality review. <u>See, e.g.</u> <u>State v. Terrance B. Burnett</u>, Lauderdale County No. 6484 (in an attack on a rival gang member, defendant and co-defendants killed a woman and child, and as the result of a plea, received a sentence of life without parole); <u>State v. Michael Brian Cardenas</u>, Chester County No. 99-001 (defendant and co-defendant persuaded victim to bring them narcotics, then kidnapped victim, shot victim in the face, and dumped the victim's car and body in the river, but received life sentence as a result of a plea agreement). In other similar cases, the jury imposed a sentence less than death. <u>See, e.g.</u> <u>State v. Eric Chambers</u>, Shelby County No. 97-03036-38(defendant and three co-defendants kidnapped and murdered three victims after stealing drugs from them; state sought death penalty, but the jury imposed a sentence of life without the possibility of parole.); <u>State v. Dewayne Jordan</u> co-defendant of Eric Chambers, <u>supra.</u> (the State sought the death penalty, but the jury imposed a sentence of life without the possibility of parole); <u>State v. Kevin Wilkins</u>, Shelby County No. 97-13179 ( defendant was the leader in a gang kidnapping, torture, and execution of victim. State sought death penalty, but the jury imposed a sentence of life without the possibility of parole.). However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a lesser sentence from a jury.

With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge Thomas T. Woodall and joined by Presiding Judge Gary R. Wade and Judge Joseph M. Tipton.   Relevant portions of that opinion are attached hereto as an appendix.

Costs of this appeal are taxed to the State.


_____

FRANK F. DROWOTA, III, JUSTICE